## THE TEUTONIA.

Two steam vessels, one an iron steamship (an ocean vessel of twenty-five hundred tons), coming from sea up the Mississippi to New Orleans, and the other a small river steamer of one hundred and thirty-five tons, trading up and down the river below New Orleans from plantation to plantation, and carrying passengers, and getting market produce for the city just named, *held*, in a case of collision, to be equally in fault for running at full speed in a very dark and foggy night, after they had learned by signals from each other of their respective existences in the river, and while they were in doubt as to what respectively were their courses and manœuvres.

APPEAL from the Circuit Court for the District of Louisiana; the case being thus:

On the night of December 30th, 1868, the iron steamship Teutonia, an ocean vessel of twenty-five hundred tons burden, then arriving by sea from Hamburg, entered the mouth of the Mississippi, meaning to go up it that night to New Orleans. She arrived at the quarantine below the city at 8¾ o'clock P.M. The night was dark and the weather very foggy. By 10 o'clock the fog had partially cleared away, and the vessel left the quarantine and proceeded up the river on her course to New Orleans. In an hour or so, and by the time that she was approaching Point la Hache, which is forty-five miles below New Orleans, the fog had increased and there was considerable rain and wind. The night, too, continued very dark.

On the same evening, the Brown, a small river steamer of one hundred and thirty-five tons, carrying passengers and market produce on the river between New Orleans and the various plantations on both sides of it below—touching first at one and then at the other, delivering or receiving cargo, and in the habit of running day and night without much regard to weather—set off from New Orleans on one of her customary trips. By 11 o'clock she, too, was nearing Point la Hache. As she approached the Point, having then just left Woodville Landing, she blew three long whistles, an in-

dication simply that a steamer was descending the river. Two short whistles were heard in reply from below. These were from the ascending steamship, and they signified that *that* vessel would go to the left bank. The steamer, whose business required her now to touch on that side, also blew two whistles in response, indicating that *she* intended to go on that side, to which indeed she was now rapidly crossing. No reply coming back from the steamship, the steamer repeated the signal, and in return the steamship blew a single whistle, to indicate that things were understood and that *she* would go to the *right* bank. Thus far there was no difficulty about the case. But the vessels unexpectedly and of a sudden found themselves in close proximity to one another. What now took place, as they thus came near each other— this being the important part of the case—was a matter about which the parties on one vessel swore in one way and those on the other swore in another and exactly opposite way. Whistles, perhaps, were blown on both vessels, but if so they were misinterpreted in the confusion of the moment, and it was plain that while the vessels were rapidly approaching, they were, both from the darkness and fogginess of the night, unconscious how near they were to each other, what were their relative positions, and what their respective purposes as to course and manœuvre.

The result of the whole was that while the owners of each vessel brought witnesses from his own vessel who swore that the engines of *that* vessel were seasonably stopped and reversed, the two vessels themselves collided with a violence impossible to have existed had this been done; and that the smaller one, the steamer, whose witnesses testified that the steamship had attempted to go between her and the left or eastern shore, went over, and so, bottom upmost, sank in the depths of the stream, here thirty-five feet deep. In this position a submarine diver, brought by her owners, testified that fourteen months after the catastrophe he examined her and "that he found a hole in her starboard side three feet and two inches in length, and four feet in depth, twenty-five feet aft the stem, and that the hole went clear through the

side of the vessel into the hull, and that the planks were started off on the opposite or port side."

Her value was $9000, and she was insured in $3000.

Her owners now libelled the steamship in the District Court at New Orleans. The libel alleged that the pilot of their steamer first stopped and then reversed her engines, and seeing that the steamship was crossing the river and approaching the steamer, hallooed to those on the deck of the approaching steamship that she would run into his steamer; that those in charge of the steamship paid no attention to this warning, but suffered the steamship to come on with a full head of steam, striking the steamer on the starboard side, making a large hole in her hull and causing her to go down.

The answer alleged contrariwise, that the pilot of the steamship, when he discovered the approach of the steamer of the libellants, ordered the helm of the steamship to be put hard-a-port; that the order was immediately executed; that the approaching steamer nevertheless kept on her course and ran with great force and violence afoul of the steamship, striking her on the *port side,* about one hundred and fifteen feet from the stern.

The District Court, at the request of the owners of the steamship, who alleged that the case involved nautical questions which no one but shipmasters could properly decide, invited two persons having experience both as masters and pilots to sit as its assessors. The assessors sat and heard both evidence and arguments. The aid rendered to the court by them, however, did not prove of great value; for while each assessor gave an opinion, and each fortified his opinion with numerous reasons to show its correctness, the conclusion reached by one was the exact reverse of the conclusion reached by the other. The court accordingly decided the case for itself, deciding that the collision was caused by the carelessness of the steamship, and that she and she alone was in fault.

From this decree the case was taken to the Circuit Court, which, disagreeing with the District Court, thought that the

steamer alone was to blame, and accordingly dismissed the libel with costs in both courts.

From that decree of reversal the case was now here.

*Messrs. Durant and Hornor, for the owners of the steamer, appellants:*

1. The steamer was one of one hundred and thirty-five tons, engaged in trade on the Mississippi River, between the city of New Orleans and the plantations below, stopping on her way down at the various plantations on both sides of the river, landing supplies and passengers; and on her way up conveying to the city, passengers and the produce of the plantations. She was a regular " coast packet," as such boats are called, plying on the river between the city and the plantations, and running day and night, in all sorts of weather; and was in fact as much of a necessity for the planters and agriculturalists of that section as the Brooklyn ferries are for those of Long Island.

The actual value of the steamer was $9000; she was insured for $3000. In view of this fact we start with the presumption in our favor that the steamer was under the management of men deeply interested in avoiding a collision.

The other vessel was an ocean iron steamship of over twenty-five hundred tons burden. She was, therefore, very nearly *twenty times* the tonnage of our steamer.

The night was a winter night, very dark and foggy; it was blowing and raining. No dispute exists as to the facts above stated. And on this indisputable case our first point is that the steamer was properly engaged in her usual business, had the right to cross and recross the river, and was not bound to " lay up;" and that on the contrary, the steamship was in fault in ascending the river at the time and under the circumstance that she did; that by so doing she very greatly and unnecessarily enhanced the perils of the river to the river steamers, and that it was *her* duty to " lay up" for the night, either at the quarantine station, whence she had set off, or at Point la Hache. She could gain nothing by going up to New Orleans that evening, for she would arrive there long before daylight.

2. If she was not bound to lay up she was assuredly bound, on such a night as this was, dark and foggy, when running at all, to run at a slow rate of speed; and upon the very first signal of a vessel above, to run with the most extreme caution and vigilance. As we have said, she was an immense iron ocean steamship, nearly twenty times the size of our wooden steamer. Our steamer might have run at full speed and have struck her and yet have done *her* no harm. *She* could not be going at her full speed and strike us at all, and not destroy us. If, therefore, we had been going at full speed (which we assert that we were not doing at the time), the catastrophe would not have occurred had the steamship been going at a properly reduced rate of speed, and had she been stopped. The force of any blow in such a case is in proportion to the *mass* and the momentum.

3. The probabilities, independently of the evidence, would be against the steamship. A man in absolute command and control of a very large vessel, an ocean steamship freighted with the wealth of the world, is far too apt, unless he be rather nobly constituted, to look down with some indifference upon all smaller craft. In a natural idea of his own importance he feels: "I have signalled that I am coming. Lookout for yourselves." But this idea, however natural, is one wholly illegal. Contrary to what it prompts, the pilot of the large vessel should respect the small one simply because it *is* small, because it *is* weak, because a collision which will do no harm at all to the large one will destroy the small one in a moment, and send it, as was the case here, bottom upwards, and almost in an instant, to destruction.

*Mr. P. Phillips, contra, for the owners of the steamship:*

1. The opposing counsel assume that the steamboat was a *privileged* vessel, and because she brought vegetables, &c., to the markets of New Orleans, that therefore she had a right to the road as against the largest vessels that cross the ocean; vessels "freighted with the wealth of the world." We deny this extensive right. The river packet-boat had

no more right than the steamship had to be in the river. If the night was so dark and the weather so misty as to make navigation dangerous, *she* was bound to stop as much or more than the steamship, for she was continually leaving the natural line of travel up and down the river, and crossing and recrossing from side to side; an operation of necessity dangerous, and one which in this case led to the catastrophe. To stop and detain for twelve hours a great ocean steamship, laden with passengers, is a costly, difficult, injurious, and (when as here the ship is almost in port). a vexatious thing to do. To stop and detain a river packet-boat is a small affair; neither costly, difficult, injurious, nor vexatious.

When the steamship left the quarantine, the weather was favorable for going up the river, unless the fog rose again, of which, at that time, there was no prospect.

It was not the same thing to the steamship whether she remained all night down at quarantine or not. She wished to be at New Orleans by daylight of the 31st December, ready with the morning to send her passengers ashore and to unload her cargo. The 1st of January would be a holiday.

2. The steamship is admitted to have been well manned, to have had proper lookouts, and proper lights in their proper places burning brightly. The officers and hands on our large ocean steamships, such as was this one, are habitually careful as to lights, lookouts, and other matters pertaining to vigilance.

There is great conflict of evidence about certain facts; the court must pass upon the weight of the evidence; but, as *we* read it, it shows that the rules of navigation were strictly complied with by the steamship; that she was sailing at the time of the catastrophe at a reduced rate of speed, and upon the first intimation of real danger, that she first slowed, and then stopped her engines and put her helm a-port.

In conclusion, there is no pretence that the collision was *wilful* on the part of the steamship. The collision was therefore *accidental*, and whether the accident is to be attributed

to the want of diligence or skill in those who controlled the ship, is the question to be solved, in considering whether the decree below should be affirmed or reversed. We see no evidence of want of skill on the steamship.

Whatever may be the rule elsewhere, it is the settled doctrine of this court, that where a collision occurs without the negligence or fault of either party, each should bear his own loss.* But if this be not so, this court will, at the most, reverse the decree in order to divide the damages. It cannot reverse to establish the view of the District Court, and to hold the steamship alone responsible.

Mr. Justice CLIFFORD delivered the opinion of the court, in effect as follows:

The pleadings and proofs sufficiently show that the approaching vessels were respectively ignorant of each other's intention as to the course they would pursue; that nothing was done by the officers and crew of the steamer which could enable those in charge of the steamship to ascertain or determine what course the steamer intended to pursue, and that those in charge of the steamer were equally in doubt and uncertainty as to what were the intentions of the steamship.

The collision occurred between eleven and twelve o'clock at night. The night was dark. Both vessels were in a pretty dense fog just prior to the collision, and inasmuch as they had failed to come to an understanding from the signals given as to what precautions would be necessary to avoid a collision, it was manifest rashness to advance until they could in some way accomplish that object. This is virtually admitted by both parties, as each alleges that they stopped their engines, though it is not possible to credit the statements that they did so, as it is clear that if such orders had been given by both parties and seasonably and effectually executed, the collision would have been avoided. The circumstances disclosed in the testimony satisfy the court

---

* Stainback *v.* Rae et al., 14 Howard, 538.

that both vessels were under headway when the collision occurred. The contradictory allegations in the libel and answer cannot be reconciled, nor is there anything in the testimony to afford much aid in that direction.

Great reliance to support the theory that the steamship struck the steamer upon the starboard side is placed by the libellants upon the testimony of a witness employed by them to examine the wrecked steamer some fourteen months after the collision. But the argument for the appellees is that such a theory cannot be supported, as the steamer of the libellants was bound down the river, and it must be admitted that the argument is entitled to weight. Still it is not difficult to see that it may be true if the residue of the libellants' theory is well founded, that the steamship actually attempted to pass up the river between the steamer of the libellants and the eastern shore of the river, as the testimony of the libellants tends strongly to prove.

Inconsistencies, however, such as these cannot be reconciled with any satisfactory degree of certainty, nor is it necessary to make any such attempt in the case before the court, since, as already said, it is clear in the judgment of the court, that both vessels were under considerable headway when the collision occurred. Those in charge of each of them knew that the other was approaching from the opposite direction, and that their efforts to come to an understanding as to the respective courses they should pursue had been unsuccessful; and they also knew that the night was dark and foggy to such an extent as to render navigation peculiarly dangerous.

Attempt is not made to set up the defence of inevitable accident, nor could it have been successful if it had been set up, as such a defence can only be maintained in a case where neither vessel is in fault. Inevitable accident in the case of a collision is where both parties have endeavored by all means in their power, with due care and a proper display of nautical skill, to prevent its occurrence, or it may result from the darkness of the night if it clearly appears that both parties were without fault from the time the necessity for

precaution began to the moment when every opportunity to avoid the danger ceased.

Precautions must be seasonable in order to be effectual, and if they are not so and a collision ensues in consequence of the delay, it is no defence to allege and prove that nothing could be done at the moment to prevent the disaster, or to allege and prove that the necessity for precautionary measures was not perceived until it was too late to render them availing. Inability to avoid a collision usually exists at the moment it occurs, but it is generally an easy matter, as in this case, to trace the cause to some antecedent omission of duty on the part of one or both of the colliding vessels. Plainly both were in fault in this case in that they continued to advance under headway in a dark night, when those in charge of them knew that there was imminent danger that they would collide. Both vessels having been in fault the rule is that the damages should be divided between the offending vessels.

Decree reversed, with costs in this court, and the cause is remanded with directions to divide the damages found in the District Court, together with the costs in both of the subordinate courts.

Reversal and remand accordingly.