Atkinson, J.,
delivered the opinion of the court:
The claims in this suit grow out of a collision between the United States army transport Sumner, outward bound, and a barge or lighter owned and operated by the Southern Railway Company and moored at its dock, which occurred in the Norfolk (Ya.) Harbor March 17, 1900. The claims were referred to this court for adjudication by the omnibus claims act of February 24, 1905 (33 Stats., 747-809). The act is printed in the findings, but the material part thereof is as follows: “ That no judgment shall be rendered against the Government unless it shall affirmatively appear from the evidence adduced that such collision was the result of negligence on the part of the United States or its agents.”
The barge and its cargo were insured, and the insurance companies holding policies thereon paid the Southern Railway Company in full for the cost of repairing the barge and the loss of the cargo, amounting to the sum of $6,580.65, taking subrogation receipts therefor, by virtue of which they appear as parties plaintiff in this suit. The railway company, however, seeks to receiver from the United States the additional sum of $2,198.15 for other alleged damages to its property resulting from the collision.
Under the jurisdictional act negligence is the gravamen of the complaint and the basis upon which this suit depends. Negligence has the same signification in marine law as in the common law. The text-books and court decisions agree, in applying the rule of negligence to navigation, that the master of a vessel must take all such precautions as a man of ordinary prudence and skill, exercising reasonable foresight, would use to avert danger in the circumstances in which he may happen to be placed.
*333 In tbe case of The Pennsylvania (19 Wall., 125, 136), Mr. Justice Strong, in delivering the opinion of the court as to the liability of vessels in collisions, said, inter alia:
“ The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory causé of the disaster. In such a case the burden rests upon the ship or ships of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.”
The findings in the case at bar show that the transport Sumner was a large vessel of 3,458 gross tons burthen; that she left her wharf at the Portsmouth (Va.) Navy-Yard, and proceeded down the Elizabeth Elver on her way to the Atlantic Ocean the day the collision occurred; that she was manned by a new crew of officials unacquainted with the character of the vessel, although her pilot was one of experience and was familiar with Norfolk I-Iarbor; that the vessel was aided by a tug in leaving the navy-yard, but it was released a short distance above the point where the collision occurred.
The Government chart or map of Norfolk Harbor, which is made a part of the findings, shows a slight bend in Elizabeth Eiver at or near the place of the collision. The depth of the water at the Southern Eailway dock, where the barge or lighter was being unloaded, was 43 feet, the middle of the channel was 26 feet, and the width of the channel was about 1,800 feet. Although a tug with two barges in tow was observed by the pilot of the Sumner descending the river when his vessel was at a point off the Seaboard Air Line docks, and a short distance below the Southern Eailway docks a large schooner was anchored in the river on the Portsmouth side, but as' the channel was about 1,800 feet wide and the distance was about 900 feet between the stern of said schooner and the Southern Eailway barge which was moored at its dock (Finding IX), there was apparently am- *334 pie room for the Sumner to have passed in safety, notwithstanding the velocity of the wind, had she been running at a speed of 4 miles an hour, as required by the law of the State of Virginia (Finding V), instead of at a speed of about 8 knots an hour, which she was then making.
The rule governing the conduct and speed of vessels entering or leaving harbors is carefully stated in Spencer on Marine Collisions, section 81, in the following language:
“ Whenever a steamer is in a situation where the frequent passing of vessels may reasonably be expected, or where the linown difficulties of navigation render a high rate of speed dangerous, common prudence requires her to go at a rate commensurate with the attending dangers. The rule does not make a steamer at fault for not reducing her speed so long as she is situated so that the ordinary precautions and rules of navigation, if observed, would prevent collision. Nor does the rule contemplate a case where collision is the result of sheer negligence or disobedience of well-known rules, but applies to cases where the emergency is such that, notwithstanding the presumption that the parties intend to perform their duties and are also to do so, there is still danger that collision may ensue. In the navigation of harbors, and crowded channels a steamer is permitted to proceed only at such a rate of speed as to enable her easily to stop and change her course from a forward to a backward one, within the distance she is liable to sight approaching vessels, making due allowance for the other’s speed. It is especially dangerous for a steamer to proceed at a high rate of speed in a harbor near piers and docks where vessels are constantly entering and emerging from their slips. A steamer entering a harbor should use the utmost caution as to its speed, and its officers are required to be in positions where the vessel’s movements may be directed with the utmost promptitude. Navigating a steamer at a' high rate of speed imposes the duty of increased vigilance, proportionately greater as there is liability of meeting other ships and difficulties in navigation. No absolute rate of speed can be established for all vessels on all occasions; it must depend upon the locality and the peculiar circumstances of the case; but it must not be such that it can not be maintained without probable risk to the lives and property of others. Excessive speed is a question of fact, to be determined largely by the locality, the hour, the state of the weather, and the ability of the vessel to be promptly cbntrolled. What might be moderate speed for one vessel might be excessive for another in the same sitúa *335 tion. What might not be excessive speed in a steamer of great power, with engines of great strength, and appliances by which it is easily and quickly handled, stopped, and backed, might be excessive in another going at the same rate, having less powerful machinery and less ability for prompt action; so that reference must be had to all the circumstances affecting the ability of a steamer to keep out of the way in determining her liability under the rules.” (The H. F. Dimock, 77 Fed. R., 226; The Nacoochee, 137 U. S., 330; The Martello, 153 U. S., 64; The Pennsylvania, 19, Wall., 125; The Corsica, 9, Wall., 630; City of Paris, ibid., 634.)
In the case before us the rule of speed for Norfolk Harbor, as we have already stated, was fixed by state statute for vessels above 1,500 tons burthen at not exceeding 4 miles per hour. If, therefore, the Sumner was unable to navigate the harbor under the prevailing conditions at that prescribed speed, she should have remained in port; or if she was compelled to sail, as appears to have been the case, she should have retained her tug, because she was required by harbor regulations to maintain only such a rate of speed as by reversing her engines she could come to a standstill in time to avoid collision; and bjr the law of the port, under no circumstance was she allowed to exceed 4 miles an hour. (The Favorita, 18 Wall., 598; The Nacoochee, supra. Also Spencer on Marine Collisions, secs. 79 and 80.)
As shown by the engine-room record of the Sumner (Finding NI), the reversing of her engines does not seem to have been either prompt or effective, sufficient at least to avoid collision and attendant liability. Nor can it be maintained that her sagging toward the Norfolk shore was due to error of judgment in extremis, as contended by defendants’ counsel. It was said in the case of The Teutonia (23 Wall., 77) that:
“ Precautions must be seasonable in order to be effectual, and if they are not so, and a collision ensues in consequence of the delay, it is no defense to allege and prove that nothing could be done at the moment to prevent the disaster, or to allege and prove that the necessity for precautionary measures was not perceived until it was too late to render them availing. Inability to avoid a collision usually exists at the moment it occurs, but it is generally an easy matter, as in this case, to trace the cause to some antecedent omission of duty *336 on the part of one or both of the colliding vessels.” (See also City of New York, 147 U. S., 72; Elizabeth Jones, 112 U. S., 514; The Sea Gull, 23 Wall., 165.)
Spencer on Marine Collisions, section 196, reads:
“ * * * To enable a vessel to avail itself of the plea of mistake, made in extremis, it must appear that the situation was induced by the fault of the other. Where the evidence shows that the antecedent misconduct of a vessel has brought it into a situation where there is no time for judicious action, the fact that an injudicious order is given, under the excitement of the moment, will not relieve it from the antecedent fault, and it may not avail itself of the plea of imminent peril as an excuse.”
Section 4235, Revised Statutes, provides that “ until further provision is made by Congress, all pilots in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States, respectively, wherein such pilots may be, or with such laws as the States may respectively enact for the purpose.”
The act of August 19, 1890 (26 Stats., 320), provides a code of rules and regulations to be followed by all jmblic and private vessels of the United States upon the high seas and all of its rivers and harbors navigable by seagoing vessels. Article 30 of these regulations is in the following language: “ Nothing in these rules shall interfere with the operation of a special rule, duly made by local authority, relative to the navigation of any harbor, river, or inland waters.”
Inevitable accident is usually confined to vessels when they are in action. In the case at bar the lighter or barge was properly and securely moored in her own dock. She therefore was in no respect responsible for the collision. Hence, to establish inevitable accident on the part of the defendants, it must be shown that the officers of the Sumner exercised due care, precaution, and nautical skill from the moment when the necessity of such precaution arose and not simply when collision was imminent. In other words, precaution must be seasonable. As was said by Mr. Justice Clifford in the case of Union Steamship Co. v. N. Y. & Va. Steamship Co. (24 How., 307):
“ It is not inevitable accident, as was well remarked by the learned judge in the case of The Juliet Erskine (6 Notes of *337 Cases, 634), where a master proceeds carelessly on his voyage, and afterwards circumstances arise when it is too late for him to do what is fit and proper to be done. ‘ He must show that he acted seasonably,’ ana that he ‘ did everything which an experienced mariner could do, adopting ordinary caution,’ and that the collision ensued in spite of such exertions. Unless the rule were so, it would follow that- the master might neglect the special precautions which are often necessary in a dark night, and when a collision had occurred in consequence of such neglect he might successfully defend himself upon the ground that the disaster had happened from the character of the night and not from any want of exertion on Ms part to prevent it.”
The case of The Columbia, (48 Fed. R., 325) is almost identical in every respect with the case at bar. A barge moored at her dock in New York Harbor was run into and sunk by The Columbia, which could not be controlled on account of a .gale of wind which was blowing at the rate of about 19 miles an hour. Mr. Justice Brown, delivering the opinion of the court, decided that it was not a case of inevitable accident, and said: “ * * * To admit of that defense it must appear that the danger was not to be apprehended, or, if it was liable to arise, that a proper watch was kept beforehand, and .seasonable precaution taken against such liability, and that reasonable skill was used when danger arose. The facts in this case fall short of these requirements.” Many other cases holding similar doctrine could be cited, but we deem it unnecessary so to do.
We do not regard the cases referred to by defendants’ counsel as decisive of the case before us. Here the right to sue having been granted by the Congress, the question is whether the Sumner violated the navigation laws, which are expressly made applicable to all public and private vessels of the United States, both in harbors and on the high seas, and whether it affirmatively appears from the findings and the decisions quoted that the collision was the result of negligence on the part of the United States or its agents?
On the 17th of March, 1900, when the Sumner left the Portsmouth Navy-Yard, no unusual difficulties confronted her in passing safely out of Norfolk Harbor, and if the rules and regulations of the harbor had been properly observed no *338 accident should hav¿ occurred, and doubtless would not have occurred. We are of the opinion, therefore, that the manner in which this unballasted vessel was taken from her moorings out into the harbor, under the prevailing conditions and handling her in apparent ignorance and disregard of the port regulations and local usage, clearly establishes such a degree of affirmative negligence as to fix upon her the sole cause of the collision.
We decline to allow the extra $1,000 claimed by the Southern Railway Company for repairing the barge or lighter, for the reason that the payments made by the insurance companies to said railway company were in full satisfaction of all damages. Moreover, the insurance companies, were not requested to pay said $1,000 under the policies,, which fully covered all damages. The party who made the repairs is not before the court, and if the alleged balance due thereon were paid it should be paid to him and not to the Southern Railway Company.
Nor do we allow said company’s additional claim of $1,198.15 for damages to the wharf and use of the lighter not included in the bill which was paid to it by the insurance companies, for the reasons that the nature and extent of the repairs to the wharf are not shown, nor is there any evidence as to when the wharf was built or when, if ever, it was last repaired. It is shown that it had been used for many years, and had been often injured by tugs and barges which necessarily came in contact with it, but its condition at the time it is alleged to have been injured by the collision in controversy is not shown by competent testimony. No allowance can be. made for the use of the lighter while it was undergoing-repairs, because its daily earning capacity, or the cost at which similar ones could be hired, is not established. Neither is the length of time consumed in making the repairs shown,, nor that the company sustained any actual loss by being deprived of its use during the period in question.
Judgment is rendered accordingly against the United States as set forth in the conclusion of law.