## THE EL SOL.

### Petition of SOUTHERN PAC. CO.

## THE SAC CITY.

### Petition of UNITED STATES.

District Court, S. D. New York.

Nov. 3, and 19, 1930.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for the El Sol.

Charles E. Wythe, U. S. Atty., of New York City (Harold F. Birnbaum, of New York City, of counsel), for the Sac City.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar, L. J. Matteson, and Andrew J. McElhinney, all of New York City, of counsel), Carter, Ledyard & Milburn, of New York City (Rush Taggart, of New York City, and D. H. Stanley, of Washington, D. C., of counsel), Single & Single, of New York City (H. T. Atkins, of

New York City, of counsel), and Slayton & Jackson, of New York City, for cargo on El Sol.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar, L. J. Matteson, and Andrew J. McElhinney, all of New York City, of counsel), for representatives of death claimant (the carpenter) on the El Sol.

WOOLSEY, District Judge.

I hold both El Sol and the Sac City to blame for the collision which is the subject-matter of these two proceedings for limitation of liability.

I hold that the United States, as owner of the Sac City, is entitled to a limitation of its liability.

It is admitted by all parties that the Southern Pacific Company, as owner of El Sol, is entitled to a limitation of its liability.

I. These two cases were tried before me as one case, and, although the procedural machinery precludes the entry of a single decree because different claims are filed in the two proceedings, the cases are the equivalent substantially of a libel and cross-libel with intervening petitions by cargo owners against the noncarrying steamship, and will be dealt with in this opinion as if that was the procedural pattern of the controversy.

II. On the morning of March 11, 1927, El Sol, a steel screw steamship built in 1910 —of 6,008 tons gross, 3,747 tons net register, 405.6 feet long, of a beam of 53.1 feet and a depth of hold of 27.4 feet—was coming up New York Bay, inward bound, with cargo from Galveston, Tex.

The Sac City, a steel screw steamship built in 1918 at Hog Island, Philadelphia— of 5,735 tons gross register, 3,445 tons net register, 390 feet long, of a beam of 54.2 feet, and a depth of hold of 27.6 feet—was going down the bay outward bound, with a part cargo for Antwerp and other European continental ports via Philadelphia, where she expected to complete her loading.

The two steamships were, therefore, substantially of the same size.

On March 11, 1927, during the period and at the place to which my attention must be directed, the wind was negligible, the weather was foggy, with a visibility, as I find, of about one-quarter of a mile, though some of the witnesses describe the fog as thick fog, and the tide was ebb running at between 1.5 and 2 knots per hour.

At about 7:45 a. m. on that day by the Sac City's deck time, which, for convenience, I shall hereinafter use, the Sac City's bow struck the starboard after quarter of El Sol, penetrating about 18 feet into her side, whilst El Sol was proceeding up the westward side of the main ship channel in the Upper Bay close to the eastern boundary of the Anchorage Grounds, and had reached a point almost opposite the Statute of Liberty.

El Sol was fatally injured and sank very near the place of the collision. Her wreck when buoyed and marked by the Lighthouse Service was found to lie W. S. W. of Governor's Island Extension Light and almost due East of the Statue of Liberty. Eventually it had to be blown up to clear the channel.

Although they had heard each other's fog whistles earlier, the vessels first sighted each other about two minutes before the collision —at 7:43 a. m. when they were approximately a quarter of a mile apart.

When they sighted each other, the Sac City was on a course about S. W. ¼ S. and El Sol on a course about N. E. ¾ N.

There was thus an angle of 172° between their courses, and the situation was obviously that of vessels meeting in a narrow channel, and with a quarter of a mile, 1,320 feet, between them, they were then between three and four ships' lengths apart.

Undoubtedly the collision would have been avoided, if El Sol had been on her proper side of the channel. Cf. The S. V. Luckenbach, 197 F. 888, 893 (C. C. A. 2). It was, I think, her wrongful insistence on coming up on the westerly side of the channel which created the initial difficulty, for when the Sac City sighted her she was almost directly ahead and apparently heading very slightly to the starboard of the Sac City's course.

The speed of El Sol, with the tide against her, was not more than about two miles over the ground, perhaps a bit less.

The speed of the Sac City over the ground, with the tide, can be tested by her own time. Her bell-book tells the story. It was 7,000 yards, 21,000 feet, from Pier 3, Hoboken, whence the Sac City started to the place of collision. This is just short of four miles. She traversed this distance between 7:16 a. m. and 7:45 a. m.—substantially a half hour. Her engines were stated in her

bell-book to have been at "slow ahead" from 7:16 a. m. until 7:43 a. m. when, as I find, she sighted El Sol. Then she was less than a quarter of a mile above the place of collision. Allowing for the ebb tide, her speed over the ground when she sighted El Sol must have been about seven miles per hour.

By all the tests laid down this was too fast for the conditions then obtaining. The Colorado, 91 U. S. 692, 702, 23 L. Ed. 379; The Nacoochee, 137 U. S. 330, 339, 11 S. Ct. 122, 34 L. Ed. 687; The Martello, 153 U. S. 64, 70, 14 S. Ct. 723, 38 L. Ed. 637; The Umbria, 166 U. S. 404, 413, 17 S. Ct. 610, 41 L. Ed. 1053; The Manchioneal, 243 F. 801, 805 (C. C. A. 2); The Bayonne, 213 F. 216, 217 (C. C. A. 2); The George W. Roby, 111 F. 601, 609 (C. C. A. 6); The H. F. Dimock, 77 F. 226, 229 (C. C. A. 1); The Michigan (C. C. A.) 63 F. 280, 287 (C. C. A. 4).

The initiative in signals was taken by El Sol. She blew a two-blast signal proposing a starboard to starboard passage. The Sac City, instead of reversing at once and blowing alarm signals, as she should have done, cf. The Teutonia, 23 Wall. 77, 85, 23 L. Ed. 44; The Transfer No. 10 (D. C.) 137 F. 666, 667; The Benalla (D. C.) 45 F.(2d) 864, per L. Hand, J., seems to have thought she could make the suggested maneuver safely, and replied with two blasts. She then failed to go to port, as she now claims, because she had not sufficient speed for good steerageway.

Having settled on a starboard to starboard passing, the two vessels exchanged two more two-blast signals, and then, finding themselves in more imminent peril, each reversed. The Sac City then dropped her starboard anchor, also without avail, for she struck El Sol, inflicting, as above stated, what turned out to be a mortal wound.

As is usual, various wholly unmaintainable contentions are made in behalf of each vessel.

It is said that the Sac City was in fault for dropping her starboard instead of her port anchor; that El Sol was in fault for not having gone full speed ahead. It is sufficient to say that these faults, if faults they were, were in extremis.

When the two vessels came in sight of each other they were approaching each other at a rate, due to their respective speeds, of approximately eight hundred and fifty feet a minute. Consequently there was not time for a great deal of consideration of maneuvers.

Having regard to their courses and speeds, their mutual bearings which must have been observable to each, and their respective positions in the tide, they should not have attempted a starboard to starboard passing which was obviously risky and which in the event proved fatal to El Sol.

As sometimes happens in evidence, one of the men on the spot has hit off the situation as I believe it existed. The chief officer of El Sol said in his deposition, "Either one could have stopped and the other one could have done it alone."

The modern tendency—instead of stopping and playing safe—to keep going and take risks, which is the cause of so many accidents, both afloat and ashore, finds another instance here.

I hold El Sol in fault for proceeding without any adequate excuse up the wrong side of the channel, cf. Inland Rules, art. 25 (33 USCA § 210); La Bretagne (C. C. A.) 179 F. 286, 287, and for initiating a starboard to starboard passing in a meeting case under circumstances not justifying such a maneuver. Cf. Inland Rules, art. 18, rule 1 (33 USCA § 203); The Transfer No. 10 (D. C.) 137 F. 666, 667.

I hold the Sac City at fault for failure to observe the rule as to fog signals heard forward of her beam, cf. Inland Rules, art. 16 (33 USCA § 192); for proceeding in fog at a speed much too great for such crowded waters as she was navigating, and for assenting to the two-blast signal of El Sol, when, having regard to the distance between the vessels, she must have known it was risky to try to pass starboard to starboard when there was so little time left to swing, and for not stopping, reversing, and blowing alarm signals as soon as she heard El Sol's two-blast signal. Inland Rules, art. 18, rule 3 (33 USCA § 203); The Transfer No. 10 (D. C.) 137 F. 666, 667.

Although the angles of the courses of the two vessels are not thereon plotted with accuracy, the whole situation is shown with substantial correctness and, having regard to the respective lengths of the two vessels, approximately to scale by United States Exhibit P, the sketch made for me on the back of a chart by Captain Knowles of El Sol at the trial.

This sketch graphically confirms, I think, my conclusion that in view of their respective speeds an attempt at a starboard to starboard passing was negligence on the part of both vessels.

III. Cargo challenges the right of the United States to limit its liability as owner of the Sac City because it must be deemed privy to conditions aboard her which caused the collision.

This challenge is based on three counts which, with my findings thereon, are as follows:

1. That the steering gear of the Sac City was not in good condition.

I find that the steering gear of the Sac City was in good condition when she sailed on the morning of the collision, but, if I am wrong, I further find that the adjustments needed, if any, were matters of steamship operation by her personnel and that her owner did not know and was not in privity with any defect therein.

2. That her lookout was incompetent and had not been properly instructed.

I find that the lookout of the Sac City was not incompetent, and that, if I am wrong in this finding, I further find that knowledge thereof was not attributable to her owner; and that, if the lookout was incompetent, I further find that his incompetence did not cause or contribute to the collision which happened as I have found for the reasons above given.

■ 3. That she sailed without her full complement of engineers.

I find that the Sac City sailed on the morning of the collision short one engineer and that the manager of her operators was aware of the fact, but that this shortage in the engine room personnel did not in any way cause or contribute to the collision.

To preclude limitation on the ground of privity or knowledge it is not, in my opinion, sufficient merely to prove that there was a failure in equipment inspection or personnel to which the shipowner was privy or of which he had knowledge. It must be shown that the fault in equipment, inspection, or personnel actually contributed to the accident in respect of which the shipowner seeks limitation.

This is a practical world and an omission to which a shipowner is privy, but which has not any causal connection with the damage for which claim is made, is venial in the eyes of the law. The Thessaloniki, 267 F. 67, 70 (C. C. A. 2).

■ IV. At the request of all parties I mention that a motion was made before Judge Mack to force the United States to give a bond as a prerequisite to securing a limitation of its liability, and that Judge Mack denied the motion without opinion and entered an order accordingly on November 9, 1927.

Whether I agreed with this decision or not, I should have to follow it as the law of the case.

I find myself, however, entirely in accord with Judge Mack's decision. It seems to me quite obvious from the provisions of the Suits in Admiralty Act allowing proceedings in admiralty against the United States, 46 U. S. Code, § 742 (46 USCA § 742), but making it unnecessary for the United States to give bonds in any such proceedings, 46 U. S. Code, § 743 (46 USCA § 743), that it should not be required to give a bond in a limitation proceeding. For whilst a limitation proceeding by the United States is not strictly a proceeding under the Suits in Admiralty Act (46 USCA §§ 741–752), it is a proceeding to assemble in concourse suits which might only be brought under that act, and all claims filed in such a limitation are in effect proceedings in admiralty against the United States.

The fact that the United States files a petition asking for a concourse of claimants is immaterial. It is still in essence the respondent, although it initiates limitation of liability proceedings. It merely asks that such suits as might be brought against it under the Suits in Admiralty Act be prosecuted conjointly instead of separately.

Technically the question of limitation does not arise until the question of liability is decided. When that is decided, as here, against the shipowner, and its prayer for exoneration is denied, then only the limitation question becomes important for then only the proceeding becomes, strictly speaking, for a limitation of the liability found.

The private owner of ships, if he has a ship arrested or attached in an admiralty suit, has to give a bond or let his vessel lie under arrest or attachment pending the decision of his case.

If he wishes he may postpone his limitation until his liability is decided adversely. It is only as a convenience to prevent multiplicity of suits, comparable to a bill of peace in equity, that the remedy of a concourse of claimants is allowed in order to get one decision on liability. Cf. Munson Inland Lines, Inc., v. Insurance Co. of North America (D. C.) 36 F. (2d) 269, 271.

When he asks this multipartite remedy,

as a condition precedent to its maintenance, the private owner of the ship has to bond her, or sell her through a trustee, and have her value deposited in court.

But as a merchant vessel owned by the United States cannot be arrested or otherwise held for security, and as the United States does not have to give bonds in cases where claims in admiralty are made against it under the Suits in Admiralty Act, the reason which requires the private owner to give bond, i. e., to give to each claimant as much security as the ship affords under the rule of concourse, wholly fails.

Without a bond the remedy against the government in limitation has the same security as under a single action, i. e., the government's credit. Thus a claimant is not any worse off and has not been deprived of anything if, having a claim in admiralty against the United States, he is forced into a limitation concourse without a bond instead of being left to contest his case separately without a bond.

V. Under the new Admiralty Rule 46½ of June 2, 1930, 281 U. S. 773 (28 USCA § 723) the court of first instance is required separately to state its findings of fact and conclusions of law.

For myself I think the above opinion ought to be deemed to conform sufficiently to the rule without the filing of any further decision, but that point of view may not be right.

It may be that in admiralty cases the Supreme Court means to require, in addition to or in lieu of an opinion, a formal decision comparable to the decisions familiar to us in the state courts and Tucker Act cases before the United States Court of Claims and this court. Under the old practice the Circuit Courts were required to file findings of fact and conclusions of law. The bar may conveniently find an example of such findings and conclusions under the old practice in The Martello, 153 U. S. 64, at pages 65–69, 14 S. Ct. 723, 38 L. Ed. 637.

▆ If this is the purpose of the Supreme Court, such a formal decision may be a necessary prerequisite to a valid decree, for the Rules of the Supreme Court in Admiralty and Equity have the effect of statutes as they are promulgated under powers delegated to it almost one hundred years ago by Congress, 28 USCA § 723, and statutes mentioned in the footnote thereto.

▆ My own belief that this opinion adequately conforms to Rule 46½ (28 USCA §

723) may be unconsciously colored, partly by a natural inertia and partly by a desire not to have an already over burdened court assume a new burden. I should, therefore, be unwilling to run the risk of having my own views affect the validity of decrees as important to the parties as these will be.

Therefore, I shall have the disposition of this case on liability consist of three stages: (1) This opinion; (2) a formal decision; (3) the usual interlocutory decree in each case.

I shall not, however, prepare this formal decision myself. If they cannot agree on a decision in accordance with this opinion, counsel for each steamship and counsel for cargo and the death claimant must submit to me in draft form and triple spacing their proposed findings of fact and conclusions of law within fifteen days from the date of this opinion.

If I need further argument or assistance on the decision I shall send for counsel. But I shall not allow any filing of exceptions to findings, and the only document which will be filed, or will find its way into the record on appeal, if any, is the finally settled decision which I will sign and which at most will, in effect, be a duplication in formal shape of what I have already done—a repetition, differently paragraphed, of the foregoing opinion on the liability of the two vessels and the right of their respective owners to limitation thereof.

Five days after this formal decision is filed, interlocutory decrees in accordance therewith and with this opinion may be submitted for signature: (1) Holding each petitioner to blame; (2) providing that each may limit its liability; (3) for the appointment of a commissioner to assess the damages suffered by the several claimants in each proceeding.

Adjustments between the owners of the two steamships of their liabilities and their cross-liabilities in respect of cargo or death claims may be arranged on the proof of damages under the respective claims in each other's limitation proceeding, on exactly the same basis as if there had been a libel and cross-libel with intervening cargo claims and death claims against the Sac City and the holding had been, as here, that she and El Sol were both to blame.

On November 19, 1930, subsequent to the filing of my opinion herein, counsel for the several parties herein having appeared before me for settlement of the findings of fact and conclusions of law in the above cases,

and having reported their inability to agree thereon, and none of them having submitted any suggestions which were acceptable to me as to findings of fact or conclusions of law herein,

Now, therefore, I do hereby order

1. That the opinion heretofore filed on November 3, 1930, stand as the findings of fact and conclusions of law in these cases and be deemed to constitute the formal decision thereof, and

2. That interlocutory decrees in accordance with said opinion be served within five days of the service of a notice of the entry of this order on the proctors for the respective petitioners.