**CHESAPEAKE & O. RY. CO.**
**v.**
**CLEVELAND TANKERS, Inc. et al.**

**THE PERE MARQUETTE NO. 12.**

**THE METEOR.**

**THE GEORGE W. MEAD.**
**Civ. A. No. 10007.**

United States District Court,
E. D. Michigan, S. D.
Jan. 22, 1954.

———◆———

Russell V. Bleecker, Cleveland, Ohio, Thomas L. Lott, Detroit, Mich., William R. Althans, Detroit, Mich., of counsel, for Libellant.

McCreary, Hinslea & Ray, Cleveland, Ohio, Hill, Essery, Lewis & Andrews, Detroit, Mich., Theo. C. Robinson, Cleveland, Ohio, Carl V. Essery, Detroit, Mich., of counsel, for Cleveland Tankers, Inc.

Sparkman D. Foster, Charles D. Meadows and Foster, Lutz & Meadows, Detroit, Mich., for T. J. McCarthy Steamship Co.

LEVIN, District Judge.

At about seven o'clock on the morning of October 28, 1950 the Car Ferry Pere Marquette No. 12 was in her slip at Detroit, Michigan, loaded with railroad freight cars and ready to depart for the companion slip in Windsor, Ontario, on the opposite side of the Detroit River. The No. 12 is owned by the Chesapeake & Ohio Railway Company and regularly transports freight cars across the river as a link in the Chesapeake & Ohio's line from Chicago to Buffalo. The Chesapeake & Ohio has two other ferries on the same run, the three ships making approximately eighteen round trips every twenty-four hours. While The No. 12 does not operate on a published timetable, its movements are governed by the necessity of depositing the freight cars on the opposite shore in time to permit them to be made up into scheduled trains, which do function on a published timetable.

A heavy fog was on the river and the sound of fog signals could be heard from several vessels in the vicinity of the slip. The captain of The No. 12 thought it advisable to delay departure. At about seven-thirty the fog appeared to be lifting. Hearing no fog signals from other vessels at this time, The No. 12's captain decided to proceed into the river. To signal her departure she blew a long blast and then backed out of her slip. After having cleared the slip, her engines were reversed and she proceeded slow-ahead up the river close inshore. Running against a current of about two and one-half miles per hour, she had a forward speed of about one and one-half miles per hour as measured over the ground. As The No. 12 started to edge out into the river, in order to cross on her usual oblique course upriver and over to the Windsor slip, she heard fog signals of other vessels approaching down-river, across whose path her intended course would take her.

At about this time the fog suddenly thickened and visibility became poor. Notwithstanding, The No. 12 held her oblique course across the river, sounding fog signals at regular intervals. Shortly, she heard a one-blast signal from an unseen vessel up-river. Ordinarily this would mean that The No. 12 should cross in front of the approaching ship. The No. 12 acknowledged the signal with a single blast and proceeded to cross the presumed path of the unseen vessel. She continued to hear the fog signals of other vessels, apparently drawing closer, followed by a two-blast signal of a different quality than the previous one-blast crossing signal. This indicated that at least one other unseen vessel was approaching from up-river. Under ordinary circumstances this would constitute a warning to The No. 12 that the second vessel intended to pass across her bow. Unable to make out the source of these signals and somewhat confused, apparently, as to the situation, the captain of The No. 12

832

nevertheless kept on the same course and at the same speed.

Suddenly the white masthead light and silhouette of the Tank Steamer Meteor was sighted about 150–250 feet to port, bearing down upon The No. 12. The Meteor, carrying gasoline from East Chicago, Indiana to Buffalo, was also a victim of the fog, which she had first encountered upon entering the Detroit River from Lake St. Clair. The captain of The No. 12 immediately sounded a danger signal but it was too late to avoid a collision. He ordered The No. 12's engines full ahead and her rudder hard left to reduce the angle of the inescapable impact. The Meteor, sighting The No. 12 at this same moment, ordered her engines full astern.

Hidden by the fog and never seen by The No. 12, there was yet another vessel to be involved in the accident, the Steamer George W. Mead. She was running parallel to The Meteor, about one hundred fifty feet to her starboard and slightly astern. The Mead had left her dock, abreast the lower end of Belle Isle, at about 6:50 A.M. that morning and was bound for Cleveland, laden with automobiles. It was The Mead which had sounded the two-blast signal heard by The No. 12 before The Meteor had appeared out of the fog.

The measures which The No. 12 and The Meteor had taken when they first became visible to one another were partially successful, and The No. 12 received only a glancing blow from The Meteor about one hundred forty feet from her stem. The Meteor was immediately enveloped by the fog again. However, as The Meteor slid off The No. 12, her bow swung to starboard and came into contact with the port bow of The Mead. This all occurred about seven minutes after The No. 12 had first backed out of her slip. Fortunately in this accident, damage to none of the vessels was very serious. The No. 12 continued on her course to the opposite shore, not even aware of the subsequent collision between The Meteor and The Mead. The latter two vessels proceeded downstream for a short distance where they anchored and, after checking their damage, resumed their journeys to their respective destinations.

The Chesapeake & Ohio Railway Company, as owner of The No. 12, brought this action against Cleveland Tankers, Inc., as owner of The Meteor, and the T. J. McCarthy Steamship Company, as owner of The Mead, to recover for the damages which she had sustained. Both respondents filed cross-libels against the owner of The No. 12, as well as against each other. The problem now is to find out which vessel, if any, is responsible for this three-way collision.

■ When an accident occurs, one or more of the actors must have been at fault unless it can be shown that a power beyond human control deprived a master of authority over the movements of his vessel. The Teutonia, 23 Wall. 77, 23 L.Ed. 44; Union Steamship Co. of Philadelphia v. New York and Virginia Steamship Co., 24 How. 307, 16 L. Ed. 699. This presumption of faulty navigation is reinforced in the instant case by the conflicting reports which come from the respective vessels. Each vessel claims that it was blowing fog signals in conformance with the safety regulations. Yet, each denies that it was able to estimate the direction and the proximity of the other unseen vessels. I must infer either that there were inattentive lookouts or that each captain kept on his course without stopping his vessel, as he was obliged to do in response to the signals which he heard.

■■ The No. 12 argues that it was entitled to venture out because it was a ferry and had a right to risk the peril of the fog, which right has been accorded to passenger ferries in some waters. The Orange, 2 Cir., 46 F. 408. The rationale of this privilege is that continuing ferry service is necessary for the movement of population in urban areas where there are no other means of crossing a water barrier. However, the existence of such a privilege is not

absolute. It depends upon how urgent is the necessity and how great are the risks. Such a right does not extend to a freight car ferry such as The No. 12 on the Detroit River. For one thing, this river is one of the most heavily traveled in the world, and chiefly by large vessels. In October of 1950, the month of the accident, approximately a hundred ships each day passed the point where the collision occurred. Only a public interest of the most urgent quality would justify a vessel's cutting across the path of such heavy traffic at a time when the river was shrouded in fog. I do not find that, under these circumstances, the necessity to deposit freight cars on the opposite shore to enable them to be included in scheduled trains was of sufficient importance to justify the risk.

In any event, even if The No. 12 were privileged to leave her slip or even if the fog had cleared by the time that she left so that there was no great risk in departing, she is not excused for the faulty navigation that characterized her subsequent movements. See The Youngstown, 2 Cir., 40 F.2d 420, 421.

While The No. 12 was still close to the Detroit shore, and the fog closed in again, the signals of descending vessels were heard. She is a highly maneuverable vessel, with double propeller and a rudder forward and aft. She could easily have maintained her position close to the shore or backed up into her slip. She asserts that the one-whistle signal which she heard was her authority for cutting across the river. There is no merit in this. As it turned out, The Meteor had not intended her one-blast signal for The No. 12 but had sounded it in response to a mistaken notion that The Mead had sounded a one-blast signal requesting the right to pass her. Under no circumstances may a vessel plead the signal of an unseen and unidentified craft as an excuse for proceeding on a perilous course. Passing and crossing agreements arrived at by means of the conventional signals may be relied upon only when the other vessel and the surrounding waters can be identified by the acting vessels. Instead of authority to cross the path of The Meteor, The No. 12 was obliged to regard this nearby signal from an unidentified vessel as a tocsin of impending danger, and she was under a duty to sound the danger signal at that very moment.[1] Again The No. 12 was defective in her

---

[1]. United States Coast Guard Pilot Rules for The Great Lakes and Their Connecting and Tributary Waters and the St. Mary's River—May 1, 1952:

*Statutory*

Rule 27

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." 33 U.S.C.A. § 292.

*Regulations*

§ 90.2

"Danger signal.—If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously or from other causes, the pilot so in doubt shall immediately signify the same by giving the danger signal of several short and rapid blasts of the whistle not less than five; and if both vessels shall have approached within half a mile

121 F.Supp.—53

of each other, both shall be immediately slowed to a speed barely sufficient for steerageway, and, if necessary stopped and reversed, until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

§ 90.10(b)

"If from any cause whatever the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped, and backed if necessary, until signals for passing with safety are made and understood."

§ 90.12

"Departure from the rules.—In obeying and construing the rules in this part due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

navigation subsequent to the two-blast signal of the unseen Mead. The already considerable peril was now aggravated by the presence of another approaching vessel. The No. 12 should have immediately sounded her danger signal upon hearing The Mead's two blasts. Instead, she held her course in defiance of this request of The Mead that she cross under her stern. I find that The No. 12's negligence in these respects contributed to the accident and to the resulting damage sustained by the three vessels.

Further, I find that the navigation of The Meteor and The Mead was also defective. As pointed out above, shortly before The Meteor struck The No. 12, the fog had closed in so that visibility was very poor. The Meteor had shut off her engines, but she was drifting with the current at a speed of about two and a half miles per hour. The Mead's engines were turning at slow ahead so that, riding with the current, she was travelling at a somewhat faster pace. Each vessel must be presumed to know that ferry boats are accustomed to cross the river in this vicinity. It was a grave dereliction of duty on their parts to proceed, as they did, in blind weather on a river as narrow and as congested as the Detroit River.

When the fog signals of The No. 12 were heard; when The Meteor heard The Mead signalling to an unseen vessel in their path; when The Mead became aware that The No. 12 did not intend to conform to her two-whistle signal and was venturing forth across the path of her and The Meteor; they were then, if not earlier, confronted with a situation of danger. Both ships were obliged to sound the danger signal and to reverse engines so that, taking the current into account, their forward progress would be arrested (See footnote 1, Pilot Rule § 90.2). This would have given The Mead and The Meteor an opportunity to come to an agreement as to safe navigating measures. It would have permitted The Mead to fulfill the solemn duty, that it here defaulted, to warn a sister vessel of a peril of which she might not be aware. At all times, the course of The No. 12 was tracked by The Mead in her radar. Yet with this certain knowledge, she did nothing to avoid the accident herself or to help The Meteor avoid it. The Mead, having injected herself into the picture and having sounded a two-blast signal which might indicate to The Meteor that the unseen No. 12 was to pass to The Mead's starboard, was guilty of misleading The Meteor when she did not warn her that The No. 12 was ignoring her signal and was heading into The Meteor's path.

The Mead denies that she had blown a signal to pass The Meteor, which The Meteor claims to have heard. Needless to say, for The Mead to have attempted to pass The Meteor under these circumstances would have been folly. But even if The Meteor had heard such a passing signal from The Mead, she had no right to assent to it in the light of the prevailing risks. It was this wrongful assent which The No. 12 had construed as a signal to cross the path of The Meteor.

These failures of The Meteor and The Mead to exercise the reasonable care demanded by the circumstances concurred with the negligence of The No. 12 to produce the resulting damage. Upon submission of satisfactory evidence of the damages sustained by each vessel, an order will be entered, consistent with the views herein expressed, making each responsible for an equal share of the total damages.