## PLANT PRODUCTS CO. v. CHARLES H. PHILLIPS CHEMICAL CO., Inc.

District Court, S. D. New York.

Oct. 16, 1936.

Ambrose Selig, of New York City (Hull, Brock & West, William E. Chilton, William H. Brown, and Jack B. Dworken, all of Cleveland, Ohio, of counsel), for plaintiff.

Watson, Bristol, Johnson & Leavenworth, of New York City (Edward S. Rogers, David A. Woodcock, and C. P. Bauer, all of New York City, of counsel), for defendant.

WOOLSEY, District Judge.

My judgment in this cause is that there must be a decree dismissing the complaint, with costs.

I. This is a patent cause, brought by the plaintiff company as assignee, based on claims 1 and 3 of United States patent No. 1,694,341, granted on December 4, 1928, to Frank Crossley, of Cleveland, Ohio, as assignor to James E. Plant of the same city, in pursuance of an application filed January 6, 1927.

The patent is for a magnesium compound and the process of producing it, and hitherto has not been adjudicated.

The principal defenses are (1) that the patent is invalid for want of invention; (2) that, if there be invention, the disclosure is insufficient; and (3) that the patent is inoperative because its asserted result is not achieved by its described process.

II. It is common ground that milk of magnesia which is also called magnesia magma and magma magnesiae in the United States Pharmacopoeia, referred to hereinafter for convenience as U. S. P., is a somewhat viscous opaque white mixture containing not less than 7 per cent. nor more than 8⁵⁄₁₀ per cent. of magnesium hydroxide, $Mg(O.H.)_2$, in colloidal suspension in water.

Magnesium hydroxide, $Mg(O.H.)_2$, sometimes also called hydrate of magnesia or magnesium hydrate as in the patent, is a substance composed of a definite number and arrangement of atoms of magnesium, oxygen, and hydrogen and is a product of a chemical combination of magnesium oxide or calcined magnesia, $Mg(O)$, with water. The water which thus constitutes an integral part of magnesium hydroxide is called its *water of constitution.*

The temperature at which magnesium hydroxide decomposes, i. e., loses its water of constitution and again becomes magnesium oxide or calcined magnesia, is not less than 572° F., a fact which apparently was not known to the plaintiff's expert until it was pressed on him at the trial after he had repeatedly given such temperature as 350° F.

The water in which the magnesium hydroxide is colloidally suspended in milk of magnesia I called, during the trial, for convenience, *interstitial water* to distinguish it from the *water of constitution* of magnesium hydroxide.

III. After stating that in order to make his tablets he uses milk of magnesia which has already been prepared or prepares it by a precipitation process, Crossley, in the relevant part of his specifications, says: "The milk of magnesia thus obtained is allowed to stand and settle, and, after as much as possible of the mother liquid has been run off, the remaining precipitate of magnesium hydrate is preferably filtered through a filter press to remove from the magnesium hydrate the larger portion of water or moisture, the effect of which is to

leave a precipitated soft mass of magnesium hydrate. This soft mass of material is then subjected to heat, in any desired manner, preferably a temperature of not exceeding 250 degrees F. or such temperature as will remove all of the moisture in the mass (except its water of constitution) without affecting its physical, chemical or therapeutical properties."

Then, after describing the process of making tablets by methods of pill making long known to pharmaceutical chemists, the specifications continue:

"The resultant tablet or wafer is stable and will not readily absorb carbon dioxide. Furthermore, it is pleasant to the taste and, when brought into contact with water or saliva readily forms therewith milk of magnesia which is smooth, bland and free from grittiness. A tablet containing moisture-free hydrate of magnesium in the proportions specified will, when brought into contact with water or saliva, yield about one teaspoonful of milk of magnesia, U. S. P."

Claims 1 and 3 of the patent are pressed in this cause. They read as follows:

"1. The herein disclosed process which comprises drying precipitated hydrate of magnesium to remove therefrom substantially all moisture, adding to such dried hydrate cornstarch and sugar mixed in proportion to form a suitable binder, and granulating and flavoring the product thus formed."

"3. A wafer or tablet consisting of dried pure prepared precipitated hydrate of magnesia mixed with cornstarch and sugar in proportions to constitute a binder and having flavoring oils incorporated therewith and of a consistency to form a relatively smooth paste when subjected to water or saliva."

IV. The patent discloses:

(1) The drying of magnesium hydroxide, called in the patent magnesium hydrate, at a temperature preferably not exceeding 250° F. in order to obtain a product capable of being formed into tablets which, when brought into contact with water or saliva, will produce milk of magnesia U. S. P.

(2) This drying is to proceed so far as to remove all the moisture in the magnesium hydroxide except its water of constitution.

(3) The mixture of the dried powder resulting, with a dry binder consisting of cornstarch and sugar.

(4) Granulation, preferably with alcohol.

(5) Addition of flavoring matter.

(6) Compression into tablets.

All these numbered steps are admittedly old and shown in the prior art, unless it be the maximum point of the specific temperature chosen for drying, and this, so far as the patent shows, is a mere matter of experimentation and convenience.

The aptest prior art references are as follows:

(1) The Sefton-Jones British patent of 1913 shows the manufacture of tablets by using one of the dried "compounds of magnesium" and says "such compounds are magnesium carbonate, calcium carbonate, magnesium oxide and magnesium peroxide"; and then makes a medicinal tablet by mixing this "in a very finely powdered state" with sugar and with starch.

The compound of magnesium mentioned in this prior art British patent is stated to be such as magnesium carbonate, magnesium oxide, and magnesium peroxide, and would obviously suggest to any competent chemist the use of magnesium hydroxide as another magnesium compound.

(2) The British Pharmaceutical Codex of 1911, admitted by plaintiff on the argument to be the closest prior art to the patent, shows at page 608 the preparation of milk of magnesia made by the same precipitation process mentioned in the Crossley patent, and says that it may be "cautiously dried" and that "it occurs as a white amorphous powder which differs from calcined magnesia—i. e. magnesium oxide—in the greater readiness with which it dissolves in diluted acids." It is stated that this dried powder may be formed into "cachets" either "alone or combined with powdered charcoal and carminatives."

The plaintiff's expert testified that "cautiously dried" would mean dried at a low temperature, so that this would conform to Crossley's requirement that milk of magnesia be made by the precipitation method and dried preferably at a temperature not exceeding 250° F.

Thus any interstitial water which would remain during Crossley's drying would also remain in the case of the British Codex method.

(3) The Martindale & Westcott Extra Pharmacopoeia of 1924 likewise shows, at page 39 of volume 1, the making of milk of magnesia by the precipitation process, and says that it may be "dried at low heat." It adds a reference to medicinal tablets containing such magnesium hydroxide.

(4) Before Crossley, there was prior knowledge and use by G. D. Searle & Co., of Chicago, Ill., and its employees, of a formula for medicinal tablets containing "magma magnesia" mixed in dry form with dry starch, sugar, and flavoring oils, granulated and pressed into tablets, such formula being Defendant's Exhibits 8, 9, and 10.

McMonies, who devised this formula for G. D. Searle & Co., understood magma magnesia as magnesium hydroxide prepared by the precipitation process.

The tablets made by G. D. Searle & Co. according to this formula were smooth and dissolved freely in the mouth.

Tablets made by G. D. Searle & Co. in accordance with such formula were advertised in the catalogues of G. D. Searle & Co. and sold to a number exceeding 4,000,000 tablets prior to the alleged invention of Crossley.

(5) Before Crossley, there was prior knowledge and use also by Sutliffe & Case Company of Peoria, Ill., and its employees, of a formula for medicinal tablets made by slaking calcined magnesia—magnesium oxide, Mg(O)—with water and drying the resultant product, mixing it with saccharine—a well-known substitute for sugar —powdered starch, and flavoring oils, and granulating and compressing it into tablets.

The product produced by slaking calcined magnesia with water, as taught by the Sutliffe & Case Company formula, was magnesium hydroxide.

Tablets made by Sutliffe & Case Company in accordance with such formula were advertised in the catalogues of Sutliffe & Case Company as "milk of magnesia" and "hydrated magnesia" tablets and were sold prior to the alleged invention of Crossley.

(6) Before Crossley, there was prior knowledge and use also by E. R. Squibb & Sons of New York and its employees, of a formula for medicinal tablets made by reacting calcined magnesia with water, drying the resultant product, and mixing it was acacia powder, saccharine, and flavoring oils, and granulating and compressing it into tablets.

Tablets made by E. R. Squibb & Sons in accordance with such formula were advertised in the catalogues of E. R. Squibb & Sons as "magnesium oxide hydrated" and sold to a number exceeding 4,000,000 tablets prior to the alleged invention of Crossley.

Long reflection on this interesting case convinces me that with this background of prior art any reasonably competent pharmaceutical chemist could have done what Crossley did.

I hold, therefore, that both the claims of the patent pressed herein are invalid for lack of invention over the prior art.

V. If, however, I am mistaken on the question of invention, always one of the most difficult questions in a patent cause, I am abundantly satisfied that the patent is invalid for lack of adequate disclosure.

Crossley's invention, as embroidered by plaintiff's expert, is alleged to consist of two factors:

(1) The use of a critical drying temperature—250° F.

(2) Stopping the drying whilst the magnesium hydrate contains not merely the water of constitution, but also a small additional amount of interstitial water not quantitatively estimated.

But the patent in suit nowhere states a critical temperature. It merely mentions for the drying of the magnesium hydroxide "preferably a temperature not exceeding 250° F. or such temperature as will remove all of the moisture in the mass" except the water of constitution.

Thus any drying temperature—70° F., 100° F., 200° F., or 212° F., etc.—is as much "preferred" as 250° F. Moreover, the word "preferably" makes it *nonessential,* in the opinion of the patentee, even to keep within the 250° F. limit; and permits temperatures of 300° F., 350° F., and more, with no indication of a limit except that found in the success or failure of the final product.

Neither of the claims herein pressed mentions temperature. Thus, if there is any such thing as a "critical" temperature, the patent fails to disclose it.

Similarly, claims 1 and 3 of the patent fail to disclose either the existence or the need of the alleged interstitial moisture discussed by plaintiff's expert. On the con-

trary, the instruction of the specification of the patent, as just noted, is to *"remove all of the moisture"* from the magnesium hydroxide except its water of constitution.

Yet the plaintiff's expert says that long before Crossley's alleged invention it was a principle well known to those skilled in the chemistry of colloids that in almost all instances it was necessary for some interstitial moisture or other separating material to be retained when a colloidal substance was dried, in order to make it successfully reversible.

█ It is the claims of a patent which define the invention, and each claim must stand or fall as itself sufficiently defining the invention independently of the other claims. Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 487, 55 S.Ct. 455, 459, 79 L.Ed. 1005, and cases there cited.

The process claim, No. 1, mentions "drying precipitated hydrate of magnesium to remove therefrom substantially all moisture." "Substantially" means, of course, so nearly free of moisture as to make the substance which is being dried behave as if entirely dry.

To conform to the invention as contended for by the plaintiff's expert, this claim would need to have added to it, as part of the process claimed, a phrase providing for the retention of sufficient interstitial water to keep the particles of magnesium hydroxide separate, and so make the resultant tablet reversible.

And so in the product claim, No. 3, there would have to be a change from the use of the word "dried" in line 15 of page 2 of the patent to some phrase indicating that the magnesium hydroxide was not to be dried entirely, and stating the critical temperature at which such partial drying should be carried out.

Without some such phrase claim No. 3 not only reads on the prior art, but is, according to the theory of the plaintiff's expert, inoperative.

VI. For the patentee's alleged objective, as contended for by the plaintiff, was to produce from milk of magnesium or magnesium hydrate a tablet, which, when mixed with a teaspoonful of water, would revert to *"one teaspoonful of milk of magnesia U. S. P."* Reversibility was confessedly the only possible basis for any claim of invention.

But it is now admitted by the plaintiff that the patent does not achieve the perfect reversibility stated in it. This, indeed, was shown quite clearly by the experiments of the defendant's expert before the trial and by the experiments of the plaintiff's expert made during the trial with the plaintiff's tablets, for both showed that the colloidal suspension when the tablet was again mixed with water was not as stable as is the suspension characteristic of milk of magnesia U. S. P.

In court during the trial five tablets produced by plaintiff as made under the patent in suit were, at the defendant's request, respectively dissolved in five teaspoonsful of water by plaintiff's expert, who used his own mortar and pestle to grind the tablets, and the resultant mixture was then shaken by him in test tubes.

The proportion of supernatant liquid, apparently clear water, showing at the top of each of the test tubes used in these experiments of the plaintiff's expert was much greater within 15 minutes than ever would be observable in milk of magnesia U. S. P., unless it had been frozen.

The proportion of supernatant liquid showing in the experiment of the plaintiff's expert during the trial was practically the same as that shown in the photographs, which represented the experiments of the defendant's expert before the trial, although confessedly the drying temperature used by the latter was only 212° F.

It is perfectly clear to me, and I find, that, whatever may be the cause, the resultant product of the mixture of the tablets with water was not *"milk of magnesia U. S. P."* and, furthermore, that this test by the plaintiff's expert in court established the integrity and accuracy of the experiments made by the defendant's expert before the trial.

These experiments, I think, led the plaintiff's counsel to admit on the argument that tablets made under the patent were not perfectly reversible.

It is my opinion, and I find that, by the drying of the magnesium hydroxide in pursuance of the supposed teachings of the patent, the *physical* properties thereof are changed so as to make it less hospitable to colloidal suspension. Its *chemical* properties are, I find, not changed. As to the effect of the change of its physical properties on its *therapeutic* properties there was no competent evidence.

It is clearly shown, in my opinion, that the patent is not operative, and I so find.

VII. Shortly and simply to sum up the whole situation involved in this cause as I see it:

Crossley succeeded in securing a patent for what was in fact only an unsuccessful experiment in chemistry, a monopoly which is obviously inconsistent with any informed public policy of promoting the useful arts.

VIII. Owing to the views above expressed, it is unnecessary for me to deal with any of the other questions raised in the briefs or on the argument.

IX. This opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½ (28 U.S. C.A. following section 723), and I will sign an order so providing. Hazeltine Corporation v. Radio Corporation (D.C.) 52 F.(2d) 504, 512; Lewys v. O'Neill (D.C.) 49 F.(2d) 603, 618; Briggs v. United States, 45 F.(2d) 479, 480 (C.C.A.6); Stelos Co. v. Hosiery Motor-Mend Corp. (D.C.) 60 F.(2d) 1009, 1013; Id., 72 F.(2d) 405 (C.C.A.2); Id., 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414. Cf. also the El Sol (D. C.) 45 F.(2d) 852, 856, 857; Southern Pac. Co. v. U. S., 72 F.(2d) 212 (C.C.A.2).

An order to this effect must be embodied in the final decree dismissing the complaint with costs, which may be presented to me by the defendant for signature on three days' notice.