## SOUTHERN PAC. CO. v. UNITED STATES.

### Nos. 482, 483.

Circuit Court of Appeals, Second Circuit.

July 31, 1934.

Martin Conboy, U. S. Atty., of New York City (Charles E. Wythe, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for Southern Pacific Co.

Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones and Leonard J. Matteson, both of New York City, of counsel), for cargo claimants of the El Sol.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

These appeals are from a single decree in two limitation proceedings which were consolidated, and which arose out of a collision between the ships, "El Sol," of the Southern Pacific Company, and "Sac City" of the United States, at 7:45 on the morning of March 11, 1927, in New York Harbor, close to the boundary of the western anchorage ground, and just below the Big Tom chan-

nel. The "Sac City" was bound out on an ebb tide of about two miles, well over on the west side of the channel; she was going through the water at about five miles an hour. "El Sol" was bound up, on the wrong side of the channel, butting the ebb at about four miles. The cause of the collision was a fog which lessened the visibility to a distance, variously estimated at between 1,000 and 2,000 feet. There is less conflict than usual between the stories, and so far as there is any, we see no reason not to accept the findings of the judge who saw most of the witnesses. He found that the "Sac City" heard the fog signals of "El Sol" before she saw her and did not stop her engines, which were then at "slow ahead." She sighted "El Sol" about two minutes before the collision—we should be disposed to put it at a little less—fine on her port bow, and headed on a course crossing from port to starboard, but at an angle of less than a point. She stopped her engines at once, but accepted "El Sol's" double blast and went ahead again at "slow." The ships thereafter exchanged two more double blasts, each time on "El Sol's" initiative, but the "Sac City" did not stop and back until about half a minute before contact. The master and pilot said that they had starboarded her helm on the first exchange, but that the ship had no steerage-way, and it was for this reason that the engines were put ahead after being stopped. At any rate she did not fall off to port at all, but on the contrary sheered a point or so to starboard, probably principally because she had let go her starboard anchor just before she struck, cutting deep into "El Sol's" starboard quarter between fifty or seventy feet forward of the taffrail. "El Sol" having stopped her engines when she heard the "Sac City's" fog signals, went ahead by starts and stops, until the "Sac City" came into view about 1,300 feet off. She says that at this time she was partly across the "Sac City's" bows and concluded for this reason that her best chance was to press on, though she did so only at half speed. She starboarded in accordance with her agreement, thus exposing her side to the "Sac City's" blow, and when it became apparent that a collision was inevitable, hard-a-ported to swing herself away. On these facts both vessels were held at fault, and each appealed. The cargo of "El Sol" also appealed from the allowance of the "Sac City's" limitation, but as the facts governing this question are separate, we reserve it for the moment.

The United States does not on this appeal challenge the correctness of the finding

that the "Sac City" did not stop her engines when she heard "El Sol's" whistle forward of her beam. That alone is enough to charge her, because to stop would probably have prevented the collision; "El Sol" needed only about ten seconds to escape even at the speed she was going, four miles. Again, the "Sac City" ought not to have agreed to a starboard passing, when "El Sol" was nearly dead ahead and asked to cross her bows. Her proper course was to stop and back, especially if she had no steerage-way with which to manoeuvre, as was the case. If both had backed, they might still have collided, but it was the less dangerous course; and it was certainly impossible to avoid collision by keeping on with a hard-a-starboard helm; each ship had only about a length and a half to move before she met the other, and the helm has little effect in so short a space; the bow will scarcely have left the course. Knight (7th Ed.) pp. 304–310. Had each backed, her bow would indeed have fallen off somewhat to starboard, but she would still have substantially presented it to the other, and the speed, already low, would have been substantially reduced. The admonition to stop and back in emergencies has been often given, and is especially imperative. The New York, 175 U. S. 187, 207, 20 S. Ct. 67, 44 L. Ed. 126. Finally, the "Sac City" changed her heading the wrong way by more than a point, and this remains unaccounted for. As we have said, it was probably due to letting go her starboard anchor, though the weight of the testimony is that the port anchor would have had the same effect. The explanation is not very satisfactory; it is that the ebb was on her starboard side and that to stop her bow was necessarily to turn her head to starboard. Yet there is other evidence that the ebb runs true at the locus in quo, and that she was straight with the thread of the channel. Both states of fact cannot be true; and the ship is in this dilemma: Either the starboard anchor did make a difference, or she ought not to have anchored at all. The judge excused this fault as in extremis, and possibly, taken alone, that was fair; yet the results of her anchoring when and as she did strongly corroborate the impropriety of her navigation as a whole. If she could not anchor and if she had not way enough to answer her helm, certainly backing was the only proper action.

■ "El Sol" was also at fault. First, she was on the wrong side of the channel. It is true that we have often condoned this; twice very recently. Baltimore & Ohio R. Co. v. U. S. (C. C. A.) 72 F. (2d) 206; Eastern S. S. Co. v. Tug Syosset (C. C. A.) 71 F. (2d) 666. But these decisions were all cases where the offending ship was visible long enough in advance to give full and seasonable information of her position, and when in addition the other ship was so situated that with the warning she had, she could easily avoid her. Here "El Sol" by her sudden emergence from the fog produced exactly that confusion on the "Sac City's" bridge which she should have anticipated, and which she cannot prove to have been without effect upon the collision. She does indeed try to excuse herself by saying that the "Sac City" agreed to a starboard passing which both ships thought safe. The "Sac City's" witnesses did not say quite that; all they said was that it was the best chance; and it is very clear that the ships would never voluntarily have got themselves into any such position. It was at best a choice between two dangerous alternatives. Certainly it is far from true that "El Sol" has shown beyond doubt that her position did not contribute to the collision; there must be some limit to the impunity with which the narrow channel rule may be disregarded. Again, as we have held the "Sac City," so we hold "El Sol" for not backing at once, instead of trying to cross the "Sac City's" bows. Moreover, if she was to cross at all, she ought not to have "loitered," as the judge put it; nor can she excuse herself by the fear of what might be ahead in the fog. There might indeed be other outbound ships, but she was in an extreme emergency which demanded immediate action, even if serious risks went with it.

■ For these reasons we think that the judge was right in holding both vessels at fault. There remains the limitation of the liability of the United States as owner of the "Sac City." This dispute centers on the fact that when the ship broke ground, out of the complement fixed in her certificate, the first assistant engineer was missing, having been given leave to join the ship at Philadelphia. Of this the United States had such notice as would charge a private owner. We have already considered the procedural duties of the parties to a limitation proceeding. The Rambler (C. C. A.) 290 F. 791, 792; The 84–H (C. C. A.) 296 F. 427, 432; In re Liverpool, Brazil & River Plate S. N. Co. (C. C. A.) 57 F. (2d) 176. Were it not for the frequent necessity of bringing several claims into a concourse, the right to limit need not be the subject of a separate suit; it is in substance always a plea in confession and avoidance, ei-

ther partial, or total, according to the existence or absence of salvage and freight. For this reason the owner may plead it as a defence to the claimant's action, if he pleases. When he proceeds by petition, he does not change his legal position on the main issues. The claimant must prove what he must prove if he were the actor; a definite tort or contract, and the petitioner's connection with it. The petitioner need show no more than that he was not privy to the wrong which the claimant has proved. Eastern S. S. Corp. v. Great Lakes D. & D. Co., 256 F. 497 (C. C. A. 1), is not to the contrary; the petitioner was held generally for failing to instruct, its servants, and the language at the bottom of page 504 of 256 F., was not, with deference, quite relevant; personal diligence is not a condition upon limitation, as it is upon immunity under the Harter Act (46 USCA §§ 190–195). At times indeed the petitioner begins by putting in his proof and, if he does, obviously he must anticipate what the claimant will prove and show himself not to be privy to all possible faults open under the pleadings. In that case he accepts an affirmative; The S. S. Hewitt (D. C.) 284 F. 911; but it is only for so long as the claimant has not declared his position.

The cargo claimants here at bar had the burden of proof to make good a claim against the "Sac City." This they did, because of the faults we have discussed, but to none of these was the United States privy. So far, therefore, the liability was limited. However, their recovery might rest on any number of faults and the United States would be liable without limitation if it were privy to any one. Sailing without the required complement was a fault, in effect a statutory fault; and although a claimant relying on that fault, must prove his case and starts with the burden against him, he will of course be entitled to any procedural advantages which he would have if he were libellant in such a cause of suit. The claimants here take the position that they may rely upon the doctrine of The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148,

as to this fault, and that the owner therefore had the burden of proof to exculpate itself beyond reasonable doubt. Assuming as much arguendo, we still think that the United States should succeed. It called the chief engineer who swore that he was at the throttle after leaving the wharf until the collision; and that he executed all the orders from the bridge without delay as they came down and were recorded on a slate by an oiler. He was corroborated by the oiler. The only basis for the claim rests in the fact that the testimony of the bridge was that the order to back followed without pause the order to stop, and that the bridge log showed them at an interval of twenty seconds; while the engine log showed the interval to have been a minute. In spite of the fact that the engine log entries were based on the nearest half minute, and that in any case they recorded not engine movements, but the receipt of the bells in the engine room, we are asked to infer from this discrepancy that the chief engineer may have left his post and delayed executing the backing signal for half a minute, or more; and that this delay may have caused the collision. In support of this house of cards the claimants called the third assistant engineer who swore that the second engineer was sick at the time, the inference apparently being that the engine room was therefore still further short-handed, making it even more likely that the chief engineer might desert his post. This testimony would be of no moment if it were to be believed, and it came from a witness discharged by the Shipping Board for repeated drunkenness. We have no doubt as to the issue. The chief engineer was bringing his ship out of a crowded harbor in a fog; of all times this was the one at which some one must be every moment at the throttle, and he was the only one to stand there. He says he was at his post continuously, and another witness bears him out; there is not the slightest antecedent reason to doubt his word. It is difficult to be serious in discussing such phantoms.

Decree affirmed.