## HAYES et al. v. SURFACE COMBUSTION CORPORATION.

District Court, S. D. New York.
April 8, 1937.

John F. Ryan, of New York City (Wallace R. Lane, of Chicago, Ill., Nathaniel Frucht, of Providence, R. I., and Benton Baker, of Chicago, Ill., of counsel), for plaintiffs.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds and Daniel V. Mahoney, both of New York City, of counsel), for defendant.

WOOLSEY, District Judge.

I dismiss the complaint herein with costs.

I. This cause was originally based on three hitherto unadjudicated patents granted to Carl I. Hayes, of Providence, R. I.

The patents involved when the cause was commenced were—

Patent No. 1,724,583, granted August 13, 1929, for which application had been filed May 12, 1928, for an electric furnace.

Patent No. 1,808,721, granted June 2, 1931, for which application had been filed May 25, 1929, for a method of heat treatment.

Patent No. 1,851,831, granted March 29, 1932, for which application had been filed February 6, 1931, for atmospheric control for heat treating furnaces.

There is not any question raised as to the jurisdiction or venue of this cause or of the locus standi of the plaintiffs.

It is claimed that a furnace made and methods of heat treatment followed by the defendant Surface Combustion Company infringed certain claims of these three patents.

Before the trial, however, for reasons which will be hereinafter suggested, the plaintiffs withdrew patent No. 1,851,831 from the suit, and now bases its suit for infringement on claims 3 and 4 of patent No. 1,724,583 and claims 3 and 6 of patent No. 1,808,721.

The first patent, No. 1,724,583, contains apparatus claims and will be referred to hereinafter as the Furnace patent; the second patent, No. 1,808,721, contains method claims and will be referred to hereinafter as the Method patent.

II. As the two patents in this suit are both directed—on substantially the same disclosures—to the art of heat treating high speed steels, some preliminary observations on the general subject, as it was explained to me at the trial, might help to put the patents here involved into their proper perspective in that art.

Steel, as is well known, is an alloy of iron and carbon. High speed steel contains about .70 per cent. carbon, 18 per cent. tungsten, 4 per cent. chromium, and 1 per cent. vanadium.

When such steel is to be used for high speed tools, it is necessary that the temperature in which it is finally heat treated be very high—in the neighborhood of 2,300 to 2,350 degrees Fahrenheit.

In such treatment the desideratum is to preserve the surface of the steel during such high heats, and to do this it is necessary to have chemically appropriate gases surround the steel during the operation. This envelope of gases is called the furnace atmosphere.

These furnace atmospheres are created by burning a mixture of gas or other fuel with air and so are often referred to as products of combustion.

Furnace atmospheres are called "neutral" when they do not contain any free oxygen and do not contain any combustible constituents; they are said to be "oxidizing" if they contain free oxygen, and they are called "reducing" if they do contain combustible constituents but do not contain any free oxygen.

To produce "neutral" products of combustion, if, for example, ordinary fuel gas is burned with air, the air supplied to the fuel is just enough to insure that all the fuel shall be consumed.

To produce "oxidizing" products of combustion, the air supplied to the fuel is greater in proportion than is required completely to consume the fuel.

To produce "reducing" products of combustion, the air supplied to the fuel is less than is required completely to consume the fuel.

The amount of air supplied to the fuel may be controlled by adjusting ordinary hand valves or by using what are known as proportional mixers to regulate the ratio of fuel and air. These were old and well-known devices prior to the granting of the patents involved in this cause and, indeed, were made and sold by the present defendant.

The surface of the steel under treatment may, at the high heats here considered, be affected in various ways, which need not be here listed, by chemical reactions between the gases constituting the furnace atmosphere and the constituents of the steel, especially the carbon and iron therein.

It is common ground, as I understand it, that heating furnaces may be adequately classified, for the purpose of this cause, as open fired furnaces, of which one type is called the semi-muffle furnace, and muffle furnaces.

An open fired furnace may be defined as a furnace in which the gaseous products of combustion for heating the furnace have direct access to the chamber wherein the

steel is heated, for ordinarily the burners for heating the furnace discharge directly into the heating chamber.

A semi-muffle furnace may be defined as a furnace having a raised floor or hearth on which the objects to be heated are supported. The burners for heating such a furnace are arranged to fire below the raised floor and the gaseous products of combustion flow up and around the hearth into the heating chamber. In such a furnace, therefore, the steel under treatment is inevitably enveloped in and protected during the heating by the gaseous products of combustion.

A muffle furnace may be defined as a furnace having a heating chamber to which the gaseous products of combustion resulting from the burning of the fuel for heating the furnace do not, as such, have access to the work but circulate around the outside of the heating chamber or furnace and leave by some appropriate vent. To secure a furnace atmosphere for a muffle furnace, even if heated by gas, requires, therefore, some means of introducing the gaseous products of combustion into the muffle.

The patents in the present cause are concerned only with muffle furnaces in which the muffle is heated by electric resistors, and, consequently, properly to protect steel treated in such furnaces a furnace atmosphere must necessarily be wholly separately created and injected in some appropriate manner into the muffle.

The high speed steel heater's problem is to secure such a balance between the inevitably resultant gases, which are products of combustion as above mentioned, as to make them, at the high heats required, less interested—if I may so express it—in the steel than they are in each other. This objective is achieved through a stabilization of the gases by superheating the furnace atmosphere whilst it is being prepared, so that its temperature is at least as high as, and preferably somewhat higher than, that of the muffle itself.

The advantage of superheating the furnace atmosphere before its introduction into the muffle was discovered after the Hayes' application for the two patents here involved, and its value is that it secures a safer "reducing" atmosphere. This is the method now followed in their commercial furnaces by both Hayes and the defendant. I think the fact that such superheating is outside of any possible ambit of the disclosure of the Marx patents, which will be hereinafter frequently mentioned, explains why his furnace has not latterly been more cordially received by the trade.

From what I have heard during this trial I may therefore, I think, fairly observe that this whole subject of furnace atmospheres at high heats is apparently still in a somewhat empiric stage of its development, although knowledge thereof is steadily increasing.

III. A. The patentee Hayes was an electrician by profession. He secured his education in the public schools of Lancaster, N. H., where he was born, and also studied between November, 1902, and April, 1903, at the New York Trade School in New York City, taking an electrical engineering course.

He then went to Providence, R. I., where he has since lived. At first he worked for electrical contractors there. Later he became an electrical contractor himself and did regular jobbing contract work.

In 1906 he became interested in electric heating. In 1910 he turned over his contracting business to a friend and went into the industrial electric heating business exclusively.

In that connection he designed equipment for the soldering of chain and mesh bags for the jewelry trade of which Providence was then the greatest center. He built a few small electric furnaces, but at that time he was not able to secure temperatures higher than 1350 to 1400 degrees Fahrenheit owing to the fact that there had not then been developed electric resistors which would secure greater heat.

He had trouble in the operation of these small furnaces which was inherent in all electric furnaces because the atmosphere in the muffle was air—and that was oxidizing.

He found that it was necessary in order to get satisfactory results to put some sort of artificial protective atmosphere in the furnace. He accomplished this in various ways, e. g., sometimes by dipping the chain in molasses, which has a high carbon content, so that when it burned off a protective atmosphere was found in the heating chamber, on the principle of what had long been known as the pack method of achieving a furnace atmosphere, and sometimes by dropping alcohol from a tube which gave an atmosphere of alcohol vapor which

served to protect the metal which was being heated.

In 1912 mesh bags went out of fashion, and the demand for them stopped. Hayes' business, therefore, came almost to a standstill.

But in 1912 electric resistors were developed which would enable the use of higher temperatures in electric furnaces, sometimes as high as 1500 to 1600 degrees.

So he continued his work doing enameling for jewelry firms with electric furnaces. This was possible because the temperatures he could then secure were adequate for the purpose and an oxidizing atmosphere was a desideratum. Accordingly he worked on various enameling jobs, and also made some furnaces and sold them to firms who were in the jewelry trade.

Between 1912 and 1919 he made experiments in treating other materials in electric furnaces.

In the year 1916 the Watson Company, of Attleboro, Mass., hired a man named Augat from the Durgin Company, of Concord, N. H. When Augat came down to the Watson Company, he wanted an electric furnace equipped as one had been equipped which he had been using for two years at the Durgin Company plant, and Hayes was asked to equip it. By Augat's instructions Hayes took one of his own electric furnaces, 6 inches high, 12 inches long, and 21 inches deep, and put across the mouth thereof a pipe perforated with a series of equi-distant holes. When a gas and air mixture was burned at these holes, a curtain of burning gas was formed across the opening of the furnace and a protective atmosphere was created in the muffle.

In 1936, about four months before the trial of this cause, Hayes saw this Watson furnace still in use at the Watson plant. The photographs, Plaintiff's Exhibits 44 and 45, illustrate it.

B. On November 2, 1920, there was granted to Richard Marx, of Philadelphia, U. S. patent No. 1,357,790, for a furnace, on an application which he had filed on October 4, 1919.

The specifications thereof contained, inter alia, the following statements:

"In heating furnaces and more particularly in muffle furnaces, oxidation of the article under treatment occurs and not only is the uniformity of the heating disturbed but there is wasteful and injurious cooling of the furnace whenever the door is opened.

"One object of my invention therefore is to provide a furnace with novel means whereby its contents may be at all times open to view but which shall not the less prevent the entrance of air into the furnace and thus avoid burning or scaling of the articles under treatment as well as cooling of the furnace.

"It is further desired to provide a heating furnace with novel means whereby its operation may be made more uniform than has hitherto been possible and the material under treatment be effectually prevented from oxidation, or if desired, exposed to a reducing action at will; the invention more particularly contemplating the provision of a gas curtain which shall serve as means of preventing the access of air to the interior of that part of the furnace in which are placed the articles being heated. * * *

"In accordance with my invention I provide means whereby a transparent curtain and closure of gaseous material is formed across the doorway of the furnace and for this purpose I mount in the refractory lining at the threshold of the doorway 5, a conduit 15 with its top surface substantially tangent with the flat bottom of said floorway forming in it a line of openings through which jets of fuel may be discharged vertically upward across said doorway. This burner is connected to a suitable source of fuel (in the present instance the gas and air mains 9 and 10) through branch pipes 16 and 17 which include stop valves 18 and 19 and are independent of the valves 11 and 12 for the supply of the main burners.

"Under operating conditions when the furnace has been brought to the proper heat by the operation of the burners 7, the valves 18 and 19 are opened and the fuel discharged from the burner 15 is ignited, with the result that it is delivered in a continuous curtain across the doorway of the furnace, forming a gaseous closure which is transparent and effectually prevents the entrance of air. * * *

"If desired my invention may be advantageously applied to a muffle furnace such as that shown in Figs. 4 and 5 in which a muffle 20 is mounted within a lined furnace casing 21 so that the fuel delivered from the burners 7 to the interior of said casing surrounds said muffle without allowing the products of combustion to enter its interior chamber 22. The casing is provided with openings 23 at its top for the escape of the products of combustion and

has a front opening or doorway 24 at whose threshold is mounted a transversely extending burner 15a.

"As before, this burner is preferably embedded in or mounted with its top surface substantially flush with the bottom of the muffle 20 so as to be practically protected thereby and its openings are so placed and spaced that it will discharge the fuel in jets, which when ignited form a burning gaseous curtain completely closing the interior of the muffle."

Claims 1, 9, and 10 of Marx' U. S. patent No. 1,357,790 read:

"1. The combination of a furnace having a doorway with means for forming a gaseous curtain of burning fuel across said doorway. * * *

"9. The combination of a furnace including a casing; a muffle mounted in the casing and having a doorway cut off from the interior of the furnace; means for heating the body of the muffle; and means for delivering a curtain of burning fuel across the doorway of the muffle.

"10. The combination of a furnace; heating means therefor; a muffle in the furnace; and means for forming a transparent curtain of burning fuel across the opening into the muffle to prevent the entrance of air thereto."

On December 6, 1921, Marx was granted a second patent for a furnace, U. S. patent No. 1,399,628, on application filed May 6, 1920.

In describing the operation of this furnace, he says:

"Under conditions of operation the muffle is externally heated to any desired or suitable temperature by fuel delivered from the burners 8 into the space 6, and oxygen is not only excluded but is removed from the interior of said muffle by the curtain of burning fuel indicated at x in Fig. 1, which is delivered across its open end from the burner pipe 15. After said latter burner has been in operation for a relatively short period only inert gases such as nitrogen and carbon dioxide remain within the muffle so that articles to be subjected to a heat treatment may be introduced through said curtain and raised to the desired temperature without being subjected to the objectionable effects of oxidation or dealing or to the alternate heating and cooling incident upon the use of furnaces having doors."

C. Meantime Hayes was following the development of resistors for making electric heat for high temperature work, and finally in 1924 he began to use glo-bars and secured heat in his electric furnaces much greater than any he had succeeded in getting before, going as high as 2400 degrees.

The difficulty with his electric furnace was that because of the source of its heat supply it did not have any protective atmosphere available which could envelop any work which was being put in it for heating, as had been characteristic of the semi-muffle furnaces which had been heated by a mixture of gas and air and had been much used in heat treating.

Hayes tried to interest several firms of tool makers in his furnace without much success as some of them had had unfortunate experiences in trying to heat tools in an electric furnace without any protective atmosphere. He then realized that it was necessary for him to devise some method of getting a protective atmosphere for his electric furnace in order to make it safe to heat steel at the high temperatures which he was able to achieve with glo-bars. He tried inserting various substances, such as oil, gasolene, kerosene, and alcohol to get such atmospheres; and he got steel and tested it to see how it would work, but he had a great deal of difficulty and if he avoided one difficulty he seemed to fall into another.

Then he tried the method which Augat, who has been above mentioned, was using in the Watson plant at Attleboro, and put a pipe across the throat of his furnace and burned a mixture of gas and air as a curtain. He claims he could not thus get such control of the atmosphere as he wanted and that damage was caused to the work which he treated.

But he succeeded in getting some tool manufacturers, such as Pratt & Whitney, of Hartford, the Union Twist Drill Company, of Athol, Mass., and Brown & Sharp, of Providence, occasionally to come and experiment with heating tools in his furnace.

Finally, circa January, 1927, he conceived the idea that he could improve the situation by burning his gas and air in a combustion pipe outside the furnace and introducing the products of that combustion, which he refers to in his patent as "combusted gases" as a curtain across the throat of the entrance of the furnace, thus at the same time keeping out the air and providing a furnace atmosphere.

In January 1927, he built a furnace to embody his curtain idea, and that is the furnace shown schematically in the drawing of his furnace patent, No. 1,724,583.

At the time when he conceived the idea of the curtain he says that he was following the general notion which, according to him, then prevailed among heat treaters, that to get a proper furnace atmosphere for the treatment of steel it was necessary to have perfect combustion, that is, combustion which destroyed all the combustibles in the products of combustion.

By September or October of 1927, however, he had come to believe that what he needed was not perfect combustion, but only partial combustion of the gases which went into the heat treating chamber via his curtain, and it was with this theory in mind that he made his application for a curtain furnace patent on May 12, 1928.

■ IV. Accordingly, Hayes in his application—which under the teachings of Weber Electric Company v. E. H. Freeman Electric Company, 256 U.S. 668, 676–678, 41 S.Ct. 600, 65 L.Ed. 1162, I am permitted to follow through its Patent Office history if, as herein, there be any estoppels claimed against the patentee in respect of the interpretation which he now seeks to put upon his claims in suit, or, in respect of the definition of any words in the claims, which are in my opinion of equivocal meaning and are not explained in the specifications— included as claim 5 thereof, the following (italics mine):

"5. In an electric furnace for heat treating metals, a work receiving chamber having an entering opening, an electric circuit, means in the circuit for heating the chamber to a high degree, the walls of the chamber adjacent its entrance being provided with a narrow slot, and means for forcing *a thin film of a combustible mixture* of highly heated gases thru said slot under pressure to form a transparent curtain."

On July 11, 1929, all the five claims advanced were rejected on the ground of lack of invention over certain prior art patents, not of interest here.

In his reply to this ruling of the Examiner, Hayes acquiesced in the cancellation of all his claims including claim 5, and put forward thirteen further claims. He substituted for claim 5 the following claim which was numbered serially 12 (italics mine):

"12. In a furnace for treating metals, a heated chamber having an opening therein open to the atmosphere and through which the materials to be treated are inserted in said chamber, said chamber being otherwise closed, means for directing an *unbroken stream of non-burning gases* under pressure across said opening and within the same to form a curtain to totally exclude outside atmospheric air from the chamber, *said gas of the curtain being inert to the metal being treated* and so discharged as to have a portion of its gases fill the heat chamber to obtain a non-reacting atmosphere therein."

Of the thirteen new claims, Nos. 6 to 11, inclusive, were canceled without prejudice as covering a process and so involving a different invention from that for which the original application had been made.

Claims Nos. 12 to 18, inclusive, were rejected on the Marx patents. When confronted thereby, Hayes realized that the Marx disclosure involved substantially the same device as he had installed in 1916 for Augat at the Watson Company's plant in Attleboro, and from which he had apparently got his first idea of a gas curtain to an electric furnace. But Hayes did not run the risk of diluting or defeating his own application by telling the Examiner that he had long known and used a device similar to the Marx curtain.

On April 8, 1929, a new amendment to the application was filed and serially numbered claims 19 to 30 were put forward.

On April 10th, the Examiner ruled on this latest application. Claims Nos. 6 to 11, 28, 29, and 30 were held by the Examiner to cover a method and so canceled without prejudice on the same ground as before.

Claims Nos. 21, 25, and 27 were allowed. Claims 19, 20, 22, 23, and 24 were rejected as not defining the applicant's invention because they were not limited to combusted gases as were claims 25 and 27 and were, therefore, held not patentable over Marx.

In response to this ruling the plaintiff addressed a letter, dated April 24, 1929, to the Patent Office and asked a reconsideration of the rejection of claims 19, 20, and 22 by substituting in claims 19 and 20, for the word "nonburning," in describing the curtain, the word "combusted." Two more claims, claims 31 and 32, were advanced. Claim 31 referred to the curtain as a stream of "noncombustible gases," and claim 32 referred to it as composed of "combusted gases."

On April 30, 1929, in response to this last application, the Examiner ruled that claim 32 might be allowed and that claim 31 should be rejected on Marx' patents, the criticism thereof being that the claims were not limited to the "combusted gases" which was the differentiation of plaintiff's alleged invention from that of Marx.

Under date of May 17th, the ruling of April 30th was answered, claim 31 was amended, and there were two additional claims, Nos. 33 and 34, filed.

The applicant's letter of May 17th, dealing with the April 30th ruling of the Patent Office, reads in part as follows (italics mine) :

"Applicant feels that he is entitled to a claim comprising the use of a *non-ignitable* gas for forming the sheet, (i. e. curtain) as such use is entirely foreign to Marx's disclosures. Claim 31 has therefore been amended to specify the use of a *non-ignitable* gas under pressure. The pressure causes the gas to have a velocity necessary for forming a thin, *non-flickering,* sheet of atmosphere-excluding gases and the non-ignitable gas produces the transparent, *colorless* gas required for correct heat control."

In answer to this application, on May 25, 1929, the Examiner ruled that claims 19, 21, 25, 26, 27, 32, and 34 be allowed. Claims 31 and 33 were rejected as indefinite and broader than the applicant's invention.

The patentee came back again, under date of June 7, 1929, and made further amended claims which were numbered 35, 36, and 37, in which the words "combusted gases" were used to describe his curtain and the applicant defined "combusted gases" as follows (italics mine):

"The essential features of applicant's control included the projection of a clear *colorless* gas of predetermined constituency, *which is not combustible,* under pressure across the furnace door opening."

Finally, on August 13, 1929, claims serially numbered 19, 21, 25, 26, 27, 32, 34, 35, 36, and 37 of the application were allowed, and became the ten claims of the present furnace patent.

Of these ten claims the Patent Office No. 25 became claim 3 of the Furnace patent, and Patent Office No. 26 became claim 4 thereof.

The two claims of the Furnace patent which are here involved read as follows:

"3. A device for controlling the atmospheric condition within a heating chamber having a door opening therein,

"comprising a combustion chamber,

"means for supplying regulated quantities of combustible and oxygen bearing gases thereto, and

"means for delivering combusted gases from said combustion chamber in an unbroken curtain across the door opening to exclude outside atmospheric air from the said heating chamber."

"4. A device for controlling the

"atmospheric condition within a heating chamber having a door opening therein,

"comprising a combustion chamber,

"means for supplying regulated quantities of combustible and oxygen bearing gases thereto to produce combusted gases of predetermined constituency, and

"means for delivering the combusted gases from said combustion chamber in an unbroken curtain across and within said door opening

"to exclude outside atmospheric air from said heating chamber and

"to fill said heating chamber with combusted gases."

It is perfectly clear from this summary of the Patent Office history of the Hayes Furnace patent that, although Hayes may have considered necessary and although his specifications may import a control of the atmosphere in the combustion chamber which would result in a controlled atmosphere of varied richness reaching the heating chamber via the curtain, as a matter of fact when faced with the Marx patent, he was forced to whittle down his claims in order to secure any patent, and thus he came to be limited to "combusted gases," which he defined as gases not ignitable or combustible.

The word "combusted" is the past participle of the verb "combust." According to the Oxford English Dictionary, the verb "combust" is now seldom used except in the past participle.

The word "combusted" derives from the past participle—*combustus*—of the Latin verb "comburere," which is defined as meaning "wholly to burn or consume," "to ruin or destroy."

By the attrition of the Patent Office, therefore, Hayes was forced to make an etymologically correct definition of the words "combusted gases" as meaning gases in which all the combustible elements had been destroyed.

Furthermore, the emphasis which Hayes places throughout his application on the *colorless* nature of his curtain also confirms the fact that it was not supposed to contain any combustible gases because as soon as there is a combustible gas in such a curtain there is a yellow surface from the combustion due to the impact of the oxygen in the air on the combustible element in the curtain. This is very noticeable if one stands at the side of the furnace and looks at the curtain slantwise, although it is not so noticeable when one stands directly in front of it and focuses one's eyes on the interior of the furnace where the work to be treated lies.

Thus Hayes emerges from the logomachies of the Patent Office with a very narrow band or range of furnace atmospheres, which leaves him almost entirely on the oxidizing side assuming that his patent be, even to this extent, valid.

■ V. I am permitted under the decision of Weber Electric Company v. E. H. Freeman Electric Company, 256 U.S. 668, 41 S.Ct. 600, 65 L.Ed. 1162, to look at a subsequent patent by the same patentee in order to see the meaning of the same or equivalent expressions which he has used in both patents. Here we find that in the second column on the second page of what we called throughout the trial the third patent, U. S. patent No. 1,851,831, granted March 29, 1932, on application filed February 6, 1931, Hayes again defines what he means by "combusted gases." In line 90 thereof, he stated definitely that his curtain was composed of gases *"which cannot be exploded or burned with air."* In such a gas there cannot be any residual combustible. It is easy to see why this patent with this inconvenient definition, though originally in the cause, was withdrawn from consideration before the trial, which proceeded on the theory that the curtain of Hayes' patent furnace contained all the carbon monoxide necessary for the reducing atmosphere now demanded by the best heat treating practice.

■ VI. A patentee may, of course, make his own glossary, but, once it is made, and, as here, he secures his patent on the basis of it, it may not be changed to meet the exigencies of litigation.

By reason of the matters above set forth, I find that Hayes is forever estopped from claiming that the curtain of his furnace is made in part of combustible gases.

VII. In September, 1928, Hayes exhibited his curtain furnace at the Philadelphia Heat Treaters Show. This furnace was of the type shown in the drawing of his patent, No. 1,724,583, with an iron pipe on the front thereof as a combustion chamber.

In December, 1928, Hayes changed the construction of his furnace, and put the combustion chamber thereof entirely inside the shell of his furnace running parallel with the front of the furnace shell and between it and the front end of the muffle.

In 1933 Hayes designed another furnace with the combustion chamber running perpendicularly to the front and directly underneath the hearth of the muffle. From the above analysis of the true meaning of Hayes' claims, it is perfectly clear—and I so find—that Hayes' commercial practice is not in accordance with his patent because in his commercial furnaces he has a combustible gas burning in his curtain which is quite visible when one of his furnaces is in operation.

Consequently, he has a broad band of atmospheres extending from the oxidizing atmospheres as far into the so-called reducing atmospheres as the best present day practice requires.

I find that Hayes achieves this band of atmospheres, as the defendant contends, by reason of incorporating his combustion chamber into the shell of his furnace, and thus letting it get the benefit of the higher heat from the heating chamber. But as I am holding both patents invalid, I do not need to discuss this phase of the case in detail.

■ It suffices here to say that Hayes does not practice what he preaches, as all patentees must in order to lay the proper foundation for a claim of infringement.

VIII. I turn now to the Method patent, No. 1,808,721, claims Nos. 3 and 6 thereof are relied on herein.

A. Claim No. 3 reads as follows (italics mine):

"3. A method of visual inspection and control for heat-treatment of metals in a furnace having an opening therein,

"comprising mixing combustible gases and oxygen bearing gases in predetermined proportions,

"combusting said gases, and

"projecting said *combusted gases* as a transparent *colorless* curtain across said opening to exclude atmospheric air."

It is quite clear that this claim is as irrevocably tied to the Hayes' glossary as

are the claims of the Furnace patent above discussed, and, if the claim involves invention, it would be limited, as were the claims of the Furnace patent, to a curtain not containing any combustible element. Consequently a reducing furnace atmosphere would be precluded and the method described would not be successfully operative as a protective furnace atmosphere for the heating of high speed steels at the high heats of circa 2350 degrees Fahrenheit at which such steels must be treated.

I shall deal later with the question of invention in respect of this claim.

■ B. Claim No. 6 reads as follows:

"6. In a method of heat treating, the steps of

"combusting predetermined proportions of combustible and oxygen bearing substances in a combustion chamber to obtain products of combustion of predetermined constituency,

"utilizing the products of combustion in a heat treating chamber as an enveloping atmosphere for material to be heat treated, and

"subjecting the material to be heat treated and the enveloping atmosphere to regulated heat."

This claim may be disposed of shortly. It is the only curtainless claim with which I have to deal herein. From the beginning of the trial it has seemed to me that this claim is not supported by the specifications, but is far too broad; for, in effect, it covers the whole prior art of heat treating as it has been shown in this cause.

I, therefore, hold that claim 6 of the Method patent is invalid.

■ IX. The two patents under discussion are patents for a combination.

All the elements of the combination were known to the prior art.

It is not even claimed, as indeed it could not be, that the patentee Hayes invented a new kind of furnace atmosphere for enveloping steel when treated at high heats.

Gas curtains were well known to the prior art, e. g., the furnace equipped by Hayes himself for the Watson Company at Attleboro; Marx' small furnace with a slot for a gas curtain, which is proved as an instance of prior use beyond any doubt, and which was exhibited to me in operation; the Marx U. S. patents Nos. 1,357,790, of November 2, 1920, and No. 1,399,638, of December 6, 1921; the Lucas British patents,

No. 164,833, of June 13, 1921, and No. 215,951, of May 22, 1924; and the Austrian patent No. 83,213, of March 10, 1921.

Electric furnaces were old, and necessarily in and of themselves were barren of any products of combustion.

To burn gas and air, however proportioned, together, and to put the resultant products of their combustion into a muffle heated electrically, although it was a sine qua non for the satisfactory use of electric furnaces in treating steel at high heats, was merely an exercise of mechanical skill. All the children of necessity are not inventions.

The collocation of these old elements in convenient form did not do something new in a new way, or something old in a new way, or something new in an old way.

Each old element did its own several job in its accustomed manner, and no new process, product, or result came out of their collocation.

The objective, which was the protection of steel under heat treatment, was unchanged. The atmosphere, if properly selected for the type of steel to be treated and the degree of heat to be used, protected the steel where they met in the work chamber or muffle as was expectable.

The process of making the atmosphere involved old methods of mixing gas and air to procure the desired content for the atmosphere.

The transference of the atmosphere from the combustion chamber to the work chamber or muffle via the curtain of gas issuing from a slot was not new for a narrow rectangular slot had long been used as a nozzle when it was wished to flatten out a fluid on its being ejected from its container.

I find, therefore, that Hayes' alleged patent was an aggregation of old elements, and not a combination of old elements cooperating to produce a new result or process. Consequently it did not entitle Hayes, who devised it, to a patent monopoly in respect of his collocation of the old elements which I have been discussing. Cf. Carbice Corporation v. American Patents Dev. Company, 283 U.S. 420, 422, 51 S.Ct. 496, 75 L.Ed. 1153; Grinnell Washing Machine Company v. E. E. Johnson Company, 247 U.S. 426, 433, 434, 38 S.Ct. 547, 62 L.Ed. 1196; Office Specialty Mfg. Co. v. Fenton Metallic Mfg. Co., 174 U.S. 492, 498, 19 S.Ct. 641, 43 L.Ed. 1058; Pennsylvania Railroad

Co. v. Locomotive E. S. Truck Co., 110 U. S. 490, 494, 4 S.Ct. 220, 28 L.Ed. 222; Pickering v. McCullough, 104 U.S. 310, 318, 26 L.Ed. 749; Reckendorfer v. Faber, 92 U.S. 347, 357, 23 L.Ed. 719; Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L.Ed. 241; Less Car Load Lots v. Pennsylvania Railroad Co. (D.C.) 10 F.Supp. 642, affirmed without opinion, 80 F.(2d) 1015 (C.C.A.2).

■ As would be expected in a cause involving such a collocation of old elements, the reasonable commercial success of Hayes' furnace was much stressed by his counsel. And, undoubtedly, marketwise, and without much advertisement it did have some success.

Such a success, however, does not ipso facto mean invention, but must be chancered in the light of all the circumstances involved and is often explicable from convenience of assembly, neatness of design, or ease of operation due to the particular arrangement of the old elements in relation to each other.

In the case of Adams v. Bellaire Stamping Co., 141 U.S. 539, 12 S.Ct. 66, 35 L.Ed. 849, there was involved the question of a patent for a lantern which was made up of a number of old elements. In the trial court a jury had found, inter alia, on special questions submitted to it that the patent disclosed no improvement which required invention as distinguished from mere mechanical skill or judgment.

The Supreme Court held that the instructions submitted to the jury were without error and agreed that the alleged patent was a mere aggregation and not a combination.

The trial court had been requested to charge the jury that the great commercial success of the Irwin lantern was strong evidence of its novelty. The trial court refused so to charge and its refusal was approved by the Supreme Court which said at page 542 of 141 U.S., 12 S.Ct. 66, 67, 35 L.Ed. 849:

"Nor, under the circumstances, did the court err in declining to instruct the jury that the fact that the Irwin lantern had practically superseded all others was strong evidence of its novelty. The question before the court upon the main issue was not of the novelty of the invention, but rather of its patentable character. Where there is no invention, the extent of the use is not a matter of moment."

This, it seems to me, precisely applies to the present cause.

Again, in the case of Office Specialty Mfg. Co. v. Fenton Metallic Mfg. Co., 174 U.S. 492, 19 S.Ct. 641, 43 L.Ed. 1058, it was held that, in a patent for book shelves, the patentee had merely made an aggregation of prior well-known devices each of which performed its expectable function in its own way, and the court said at page 498, of 174 U.S., 19 S.Ct. 641, 643, 43 L.Ed. 1058:

"Hoffman [the patentee] may have succeeded in producing a shelf more convenient and more saleable than any which preceded it, but he has done it principally, if not wholly, by the exercise of mechanical skill."

To the same effect was Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U.S. 426, 433, 38 S.Ct. 547, 62 L.Ed. 1196, wherein the Supreme Court, after holding that a washing machine patented by one Phillips consisted merely of an aggregation of old elements, dealt with the question of improvement and saleability thus at page 434 of 247 U.S., 38 S.Ct. 547, 550, 62 L.Ed. 1196:

"Phillips may have produced a more convenient and economical mechanism than others who preceded him, but superiority does not make an aggregation patentable. * * * The assemblage of the old elements, and their operation in the manner indicated may save time, and the mechanism may meet with a readier sale than other similar devices, but these things may result from mechanical skill and commercial enterprise, and do not necessarily involve invention.

"To borrow an illustration made at the argument, we think the Phillips aggregation of elements may be likened to the operation of a number of different machines in a factory by power applied from the same line shaft, each operation contributing its separate part to the production of a given result. So in this instance we think the combination accomplished by Phillips fails to show that exercise of invention, producing a novel and useful result from the co-operating action of the elements, which is essential to distinguish patentable combination from an aggregation of old elements so placed by mechanical skill as to do work more rapidly and economically."

I have quoted from these opinions of the Supreme Court to show to plaintiffs' counsel that I have not forgotten that whenever I asked him to explain to me the essence of the Hayes invention, his inevitable reply was that "the heating trade was cordial to the Hayes furnace," or words to that effect.

But it has always seemed to me perfectly clear that it is only when a court is faced by a nicely balanced question of invention that commercial success should exercise the casting influence in reaching a decision in favor of the patent.

X. For the reasons which I have given, I hold that claims 3 and 4 of the Hayes Furnace patent, and claim 3 of the Hayes Method patent are invalid for lack of invention, and that if what Hayes was doing really involved any advance in the art of heat treatment of steel, it was merely an evolutionary step therein which does not entitle him to a patent monopoly based on the claims involved in this cause.

In view of the finding I have made above, it is unnecessary for me to discuss the other interesting questions that were dealt with during the long trial which was had in this cause.

XI. This opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½, title 28 United States Code, § 723 (28 U.S.C.A. following section 723), and I will sign an order so providing. Hazeltine Corporation v. Radio Corporation (D.C.) 52 F.(2d) 504, 512; Briggs v. United States, 45 F.(2d) 479, 480 (C.C.A.6); Stelos Company v. Hosiery Motor-Mend Corporation (D.C.) 60 F.(2d) 1009, 1013; Id., 72 F.(2d) 405 (C.C.A.2); Id., 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414; cf. also El Sol (D.C.) 45 F.(2d) 852, 856, 857; Southern Pacific Co. v. U. S., 72 F.(2d) 212 (C.C.A.2).

An order to this effect must be embodied in the final decree dismissing the complaint with costs which may be presented to me by the defendant for signature on three days' notice.