### TOFT S. S. CO., Limited, et al. v. THE LUSO et al.

### SOCIEDADE GERAL DE COMERCIO INDUSTRIA E TRANSPORTES, LTDA., v. TOFT S. S. CO., Limited.

### THE HARFRY.

### THE LUSO.

### No. 87–A.

District Court, D. New Jersey.

July 12, 1946.

See, also, 39 F.Supp. 893.

William T. Ard, of Jersey City, N. J. (Haight, Griffin, Deming & Gardner and John W. Griffin, all of New York City, of counsel), for libelant.

Leslie C. Krusen, of Philadelphia, Pa. (Krusen, Evans & Shaw, of Philadelphia, Pa., of counsel), for cross-libelant.

FORMAN, Judge.

This proceeding arose out of a collision which occurred December 10, 1939 south of Dunkirk Road near the entrance to Dunkirk Harbor, France. It involves in personam actions between Toft Steamship Company, Limited, the owner of the S.S. Harfry of British registry and Sociedade Geral De Comerico Industria E Transportes, Ltda., the owner of the S.S. Luso of Portuguese registry, and in rem actions between the respective ships by their owners, the owner of the Harfry having filed the original libel and the owner of the Luso having filed a claim and cross libel. By consent of parties the causes of action upon the libel and cross libel were consolidated for trial. The libel on behalf of the Harfry was amended to include a claim for loss of personal effects of her master, officers and crew. On the trial in this court evidence was offered including testimony on both sides in the form of depositions taken abroad about two years following the occurrence of the collision. The claimant and cross-libelant questioned the jurisdiction of this court, but in an

earlier decision jurisdiction to hear the cause was retained.

Annexed hereto will be found a diagram traced from the chart of the harbor at Dunkirk, France. Inshore buoys num-bered 14, 16 and 18 are indicated, and the other numbers together with curves show the depth of the water in feet at low water. The area north of the buoys was formerly a marked passage leading to the channel protected by jetties shown at the right of the drawing, but at this time that area was mined and not navigable. Thus, traffic was routed close to the French shore so as to pass south and inshore of Bouy No. 16.

The Luso is a comparatively large vessel: 460 feet long, 58 foot beam, and drew 25 feet 11 inches aft. The Harfry is smaller: 200 feet long, 32 foot beam, drawing either 15 feet and 6 inches or 13 feet 6 inches aft on the day of the collision.

Testimony shows that the variation be-tween low and high tide was about 17 to 18 feet, that the condition at the time of the collision was about half-flood, and neither party contends that the water was more than 8 feet deeper than the chart soundings indicate.

On the morning of the collision the weather, sea and visibility were good, and the tide was running about two knots from west to east approximately parallel with the buoys.

Shortly before 9 a. m. the Harfry left her anchorage in the vicinity of Buoy No. 9 west of Buoy No. 14. The Luso was anchored east of the jetties and got under way around 8:45 a. m. on a westerly course so as to proceed past the jetties and inside the buoys shown on the diagram. Both ships had local pilots aboard. The Luso was sighted before she reached Buoy No. 16, and the Captain of the Harfry testified that his ship lay off Buoy No. 14 to wait for the Luso to come through the pass so that "we would not pass abreast of Buoy No. 16", and that his holding back was not in accordance with any traffic regula-tions but for "decency's sake".

As the Luso passed the jetties she gave a long blast, made full speed (10 knots), straightened out, angled her course with reference to Buoy No. 16 and reduced speed to "slow ahead", estimated to be around two knots. The collision occurred just west of Buoy No. 16.

The Captain of the Harfry testified that the Luso was having difficulty as she passed

abreast of the piers because she got in too close, and was sheering about in the current, and we assume this alleged trouble was mentioned to show some justification for his estimate that afterwards she passed about 300 feet inshore of Buoy No. 16. He later admitted, however, that her alleged trouble at the piers caused him no embarrassment.

When the Luso was in the vicinity of Buoy No. 16 she made a short blast and the passing signals which followed occurred within two minutes according to her log and the testimony of witnesses. At this time, the testimony of the Harfry's Captain is to the effect that the Harfry was still "dawdling" at Buoy No. 14, giving her engines a kick now and then, cutting in towards land with the Luso about three points on the port bow, and in response to the signal her engines were put "slow ahead" (2 to 3 knots) and her helm hard astar-board and a short blast was given. The Luso made another short blast which was answered by the Harfry and the latter's Captain states she was still obeying the signal but getting close to shore. The Luso made a third short blast when the ships were four or five ship lengths apart (according to the Harfry's Captain) which the Harfry answered with two short blasts, and the Luso in turn replied with two short blasts.

When the Harfry crossed signals the range between the ships was estimated to be 400, 600 or 1,000 feet, and she rang up "full speed ahead", came to port and the Luso made what appears to be a slight alteration to port. While the Harfry was crossing, her Captain, who was in the Pilot House, rang up "full speed astern", but this was immediately altered from the bridge by the Pilot to "full speed ahead". When the ships were 40 to 50 feet apart the Harfry shifted her rudder to starboard in an effort to swing her stern clear of the Luso's bow.

It is contended that the Luso dropped her starboard and port anchors in succession. She reversed her engines, and her bow struck the Harfry's starboard side abaft the beam about two-thirds the length from her bow. The Harfry then swung around the Luso's starboard side between her and Buoy No. 16 which was about 40 feet away on her port side (Harfry's). She made for the beach where she settled. Included in her losses were her logs and records.

Evidence with regard to speed, state of the tide, range, and the position of the ships in the channel, is not exact. The Harfry contends that the Luso proceeded at an excessive speed, that she was too far inshore, that she did not alter her course to starboard pursuant to her whistle signal, that she failed to alter her course to port as later agreed upon, and that she was at fault in dropping the starboard anchor for that veered her bow into the Harfry's side. The Luso contends that she was on her side of the channel (outboard), that the Harfry was at fault in crossing her bow and for reversing her engines while executing the maneuver, that the Harfry must have made a helm error when she cut across, that the Harfry failed to alter course to the right pursuant to her responsive signal, that she dropped both her anchors simultaneously, that the Harfry was not "dawdling" at Buoy No. 14 when the first short blasts were exchanged, but was on a straight course in the channel between Buoys 14 and 16, and that the failure of the Harfry to produce her logs and records constitutes an admission against her.

The provisions of the International Rules of the Road with reference to passing signals are as follows:

"When two steam vessels are meeting end on, or nearly end on, so as to involve risk of collision, each shall alter her course to starboard, so that each may pass on the port side of the other." Article 18, 33 U.S.C.A. § 103.

"When vessels are in sight of one another, a steam vessel under way, in taking any course authorized or required by these rules, shall indicate that course by the following signals on her whistle or siren, namely:

"One short blast to mean, 'I am directing my course to starboard.'

"Two short blasts to mean, 'I am directing my course to port.'

"Three short blasts to mean, 'My engines are going at full speed astern.'" Article 28, 33 U.S.C.A. § 113.

The Harfry's captain places his ship at Buoy 14 at the time of the first exchange of short blasts, and claims that he was "dawdling" there so as not to pass abreast of the Luso at Buoy 16. He testified that he was cutting in toward land across the Luso's bow, and was unable to accept her third short blast because at that time he had already gotten too close to the beach, was crowded by the Luso and for that reason made the signal indicating he would cross to port, to which the Luso replied. He further testified that the exchange of whistle signals was rapid, and the Luso's log shows that they were exchanged within a period of less than two minutes. The chart indicates it is more than a mile between the two buoys, and the testimony shows that the collision occurred not far west of Buoy 16. This collision could not have occurred in this area if the Harfry were in the position claimed by her Captain, and the court finds that she must have been on a course somewhere in the channel between the two buoys and closing Buoy 16.

In so far as the speed is concerned the Harfry calculates that the Luso must have been making 7 knots through the water and that this was excessive. Logs from the Luso show that she made "full speed" (10 knots) as she passed the jetties, but it is claimed that it was afterwards reduced to "slow ahead" (2 knots). The court is not persuaded that the speed of the Luso was excessive in any event or that this was a contributing factor.

It is unfortunate that the attitude of "decency" which moved the Captain of the Harfry to "dawdle" at Buoy 14 so that the two vessels would not pass abreast of Buoy 16 did not continue, and it is odd that it did not, since our observations of the chart show that the channel is approximately as narrow at any place between the two buoys as it is at Number 16. However clear it may be that the collision would not have occurred but for the failure of the Harfry to give way to the Luso, the court is not prepared to say that this omission conflicts with general prudence and is fatal in the absence of some specific regulation.

Testimony in behalf of the Harfry with reference to the position of the Luso as she passed Buoy 16 is that she was 250 to 300 feet inside while the witnesses for the Luso testified that she passed close to the buoy. The chart on this issue shows that within approximately 250 feet from the buoy the water shoals from 23 to 13 feet and that it is about 400 feet to the 10 foot curve south of the buoy. Even when allowances are made for the increased depths due to the tide, it is apparent having in mind the respective drafts of the vessels, that the Luso must have been outside the 13 foot curve which would allow her 250 feet within which to navigate, and assuming she used all this space, the Harfry still had 150 feet within which to navigate. The chart, therefore, refutes the claim that the Luso crowded the Harfry.

It is claimed that the Luso failed to alter course to starboard according to her one blast signal, and it is also contended that the Harfry failed to alter to starboard pursuant to her response to that signal. The Rules of the Road, Article 28, supra, state that a one blast signal means, "I am directing my course to starboard", and in the case of The Lisbonense, 2 Cir., 53 F. 293, it is declared that helm action is required. According to our interpretation of the evidence, the Luso was on her side of the channel. She was prevented from going too far to starboard because of a mine field, but there is no claim that she did not go to starboard on the execution of the first short blast. It must be remembered that passing signals were exchanged in less than two minutes according to the Luso's log and according to the Harfry's captain the exchange was rapid. It, therefore, appears to the court that the situation as it existed when the Harfry replied to the second short blast of the Luso could not have been materially different from the circumstances as they existed at the time the Luso sounded the first short blast. The admonition to stop and back in emergencies has often been given. Southern Pac. Co. v. United States, 2 Cir., 1934, 72 F.2d 212. Instead, however, the Harfrey responded to the signal and indicated her approval

of the proposed passing port to port. However, in a very short time and after the Luso sounded the third short blast the Harfry gave two short blasts and undertook to cross the bow of the Luso and alter a normal port to port passing. Rules of the Road, Article 18, supra. It would seem that the greater responsibility for the due execution of the signal to pass to the left rested upon the Harfry. The Geo. L. Garlick, D.C.E.D.N.Y., 1898, 91 F. 920.

In the case of the Valley Forge, 3 Cir., 1903, 124 F. 192, the Carisbrook was going downstream in the Delaware and signaled a port to port passing which was agreed upon by the Valley Forge coming upstream. The Valley Forge later made two blasts and attempted to pass starboard to starboard, but collided with the Carisbrook which had sounded the danger signal and reversed her engines. The court ruled that the Valley Forge should not have crossed signals after accepting a port to port passing, that the Carisbrook was free from fault, and affirmed the lower court's decision.

In the instant case it might be argued that the Luso was at fault for accepting the cross signal of the Harfry, for she answered with two blasts. The Richard J. Barnes, 2 Cir., 1940, 111 F.2d 294; Southern Pac. Co. v. United States, supra. It appears, however, that at the time the Harfry changed her course to port the range between the vessels was somewhere between 400 and 1,000 feet. The Harfry was smaller and more maneuverable, and in view of the fact that the impact was received in the area of her starboard quarter, the court is constrained to the finding that the range was ample for her to execute this maneuver. This view is strengthened by the fact that at this time the Harfry was making "full speed ahead" and at a critical moment there was a difference of opinion between her Captain and pilot which resulted in a momentary reversal of engines. We believe that this confusion on her bridge was a contributing factor in spite of the testimony of her engineer that there were only a few revolutions of the propellers in that direction.

Beyond this point the only complaint is that the Luso first dropped her starboard anchor which thrust her bow against the Harfry. The applicable rule is stated in The Lafayette, 2 Cir., 1920, 269 F. 917, 925: "* * * if one vessel places another in a position of extreme danger by wrongful navigation, the other ship is not to be held to blame if she does something wrong and is not navigated with perfect skill and presence of mind."

The libel, as amended to include damages for the loss of the personal effects of the crew, against the Luso in rem and against her owners in personam is dismissed. The cross libel against the Harfry in rem and against her owners in personam is sustained. Since no objection to libelant's application for limitation of liability is offered, recovery by cross-libelant shall be limited pursuant to statute.